Filed 2/26/15

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
)      S093235
    v. )
)
JERROLD ELWIN JOHNSON, )
)      Lake County
    Defendant and Appellant. )    Super. Ct. No. CR4797
_____ )

    A jury convicted defendant Jerrold Elwin Johnson of the first degree murder of Ellen Salling with the special circumstances of robbery murder, burglary murder, and carjacking murder, as well as first degree burglary, first degree robbery, and carjacking. (Pen. Code, §§ 187, 190.2, subd. (a)(17)(A), (G), (L), 211, 215, subd. (a), 459.)[1] The jury also found that defendant personally used a deadly and dangerous weapon, and the victim was 65 years old or older. (§ 667.9, subd. (a), former § 12022, subd. (b)(1).) Defendant admitted that he had suffered one prior serious or violent felony conviction and had served one prior prison term. After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

## I.  THE FACTS

### A.  Guilt Phase

#### 1. Overview

On December 18, 1998, the police tried to stop the van defendant was driving to arrest him for violating parole.  Rather than stop, he led them on a high-speed chase, crashed his van, and escaped on foot.  The next morning, he entered 76-year-old Ellen Salling's home, beat her to death, and stole her purse, jewelry, and car.  He went to a casino with his girlfriend, used the victim's credit card to make purchases, and tried to sell the jewelry.  Later, while driving Salling's car, he again led police on a high-speed chase, which ended when he crashed this car and fled on foot.  But this time, he was eventually captured.

At trial, defendant did not dispute that he killed Salling and stole her property, but he did dispute that he formed the intent to steal before he killed her.

#### 2. The Evidence

In December 1998, defendant was living with Starlene Parenteau in Clearlake Oaks in Lake County.[2]  They shared the master bedroom.  Midday on December 18, defendant was working on a car at a friend's house in Clearlake Oaks.  He was wearing steel-toed boots, a corduroy shirt, and a plaid jacket.  After noon, defendant left in his van to retrieve a tool and did not return.

Later that afternoon, Lake County Deputy Sheriff Mike Morshed was on patrol in a marked patrol car in the Clearlake Oaks area.  He had been informed that defendant had violated parole.  He observed defendant driving a van and tried to stop him to arrest him for violating parole.  When he did not stop, Deputy Morshed turned on his lights and siren, and a high-speed chase ensued.  The chase

---

[2]     All dates are to the year 1998 unless otherwise indicated.

ended when defendant's van hit a tree and came to a stop in thick vegetation off a dirt road. Defendant abandoned the van and fled on foot. He escaped capture despite a search involving at least 20 law enforcement personnel and a helicopter.

Ellen Salling, 76 years old, lived alone in the Kono Tayee area of Lucerne, about five miles from where defendant abandoned his van. Defendant was familiar with the area, as he had had a paper route there the year before, and Salling was one of his customers. Salling normally kept her car, a red 1999 Mercury Sable, in her garage, accessible from the main house through a breezeway. Salling's friend and neighbor, William Ellis, and her daughter testified that she normally kept her purse on a counter in the kitchen and her car keys either in the purse, on the counter, or in a dish on the counter.

Ellis visited Salling the evening of December 18; they planned to go to a party together the next day. Around 7:00 a.m. the morning of December 19, another neighbor saw Salling walking near her home. Between 8:00 and 8:30 a.m., that same morning, a different neighbor observed a man in a plaid jacket drive Salling's car away from the area. A short time later, Ellis went to Salling's home. When it appeared she was not home and her car was not in the garage, he assumed she had gone shopping and left.

Ellis returned around 5:20 p.m. that afternoon and observed that Salling's car was still missing. Concerned, he entered her house through the garage, using his key. There was cookie dough and a mixer on the kitchen counter, indicating Salling had been baking cookies for Christmas. Then he discovered Salling's body, face down and surrounded by blood, near the front entryway. Her glasses were on the floor nearby. He called 911.

The evidence showed that Salling had been beaten to death. Her assailant had used a tree limb that came from outside the house and was found broken into pieces near the body, the leg of an ottoman, and boots. The limb "had some wood

3

decay fungi in it," which might explain why it had broken. Although the tree limb had no blood on it, a piece of raw wood found near the body did. Bloody bootprints were found on the victim's back. Blood was found throughout the house, including blood smears on a kitchen counter. Various drawers had been opened and ransacked. Salling's car, her purse, and several pieces of her jewelry, worth over $13,000, were missing. There was no evidence of a forced entry.

Starlene Parenteau testified that early in the morning of December 19, law enforcement agents came to her home looking for defendant. He was not there. Shortly after midnight on December 20, she came home and found a bracelet, a brooch, and a gold necklace on the kitchen table. Some of these items were later identified as having belonged to Salling.

Around 3:00 or 3:30 a.m. that same morning, defendant called Parenteau. This was his first contact with her since he left on December 18 to work on the car. He asked her to meet him at a creek behind her house because, he said, his parole officer was looking for him. He did not want to go home out of concern that he might be found. Parenteau met him as he asked. He was wearing new clothes and shoes and was driving Salling's red Mercury. He told her he had bought the clothes at a Walmart store and gave her the receipt for the purchases. He told her he had borrowed the car from some friends and was "hiding from the cops."

Defendant and Parenteau went to Cobb Mountain, then spent the night of December 20 to 21 at a motel in Middletown. The man who checked them in testified the car they were driving resembled a photograph of Salling's car. Defendant told Parenteau he had left behind the jewelry she had found on the table. He gave her three rings which were later identified as having belonged to Salling. He told her he had gotten the jewelry from the mother of someone who owed him $300.

4

Defendant and Parenteau went to a casino, then to other places, where defendant attempted, unsuccessfully, to sell the jewelry for cash and methamphetamine. At some point, they went to the home of Shiree Hardman and Jeff Biddle, where defendant tried to sell them some rings, and they smoked some methamphetamine. At trial, Hardman said the car they were driving resembled a photograph of Salling's car.

Defendant gave Biddle a piece of paper that Hardman later gave to the police. On the paper was written Salling's name and personal information and the notation, "I approve 250.00." Parenteau testified that defendant wrote the note. A questioned documents examiner who compared the note to defendant's known handwriting testified that defendant "probably" wrote it. Defendant or Parenteau told Hardman that they had gone to a casino and would go again that night. Defendant offered to pay Hardman and Biddle $50 to verify a credit card if someone called asking for verification. Hardman declined to do so. Either Hardman or Parenteau also gave defendant a yellow piece of paper to write on.

During this time, defendant purchased some gasoline using Salling's credit card. Eventually, defendant and Parenteau drove back to Clearlake Oaks, where defendant dropped her off near their home.

In the early morning hours of December 21, Lake County Deputy Sheriff Robert Zehrung, while on patrol, observed Salling's red Mercury in the Clearlake Oaks area. The driver matched the description of the suspect in Salling's killing, so Deputy Zehrung tried to stop the car. Another high-speed chase ensued; the chase reached speeds as high as 120 miles per hour and involved other law enforcement vehicles. Around 3:50 a.m., Deputy Zehrung observed the Mercury "veer off the right shoulder of the road, strike an embankment, and come to a stop." He called for backup assistance, then determined that the suspect had left the scene. A massive search followed. Around 8:50 a.m. that morning, defendant,

5

suffering from hypothermia, was captured. Deputy Zehrung identified him as the driver he had pursued.

When defendant was captured, officers found a folded yellow piece of paper resembling the paper he had obtained at Biddle and Hardman's residence. On it was written a date, "12-21-98," and this message: "I Ellen Salling give Jerry Johnson my nephew permission to use my visa for $250.00 if any questions you can call me at 995 1608. I am bedridden and unable to do it myself." Then followed the name Ellen Salling and Salling's driver's license number. Hardman testified that the telephone number in the message was hers and Biddle's. The documents examiner testified that the handwriting was probably defendant's and was not Parenteau's, Hardman's, or Biddle's.

The Mercury contained bloodstains and defendant's fingerprints. A local resident later found Salling's purse and parts of the ottoman that had been near her body on a hillside overlooking Clear Lake. A group of high school students assisting in the search found other parts of the ottoman nearby.

During a search of defendant's home pursuant to a search warrant, the police found some of Salling's jewelry and one of her credit cards in the master bedroom. They also seized a bloody corduroy shirt and bloody pants from the same bedroom. Parenteau testified that defendant was wearing the shirt when he left her house on December 18. A criminalist testified that the weave pattern of the shirt's fabric matched a pattern left by some blood found on a wall near Salling's body. Deoxyribonucleic acid (DNA) testing and other evidence showed that Salling was almost certainly the source of the blood on the shirt and pants, on the piece of raw wood found near her body, in the Mercury, and on parts of the ottoman.

Defendant cross-examined prosecution witnesses, but he did not present any evidence of his own.

## B. Penalty Phase

### 1. *Prosecution Evidence*

Defendant was convicted of burglary in Arizona in 1981 and of the voluntary manslaughter of Jennifer Von Seggern in 1993 in Sonoma County.

The prosecution presented evidence that in 1988, defendant assaulted and threatened to kill Pamela Braden, his then-girlfriend, causing multiple injuries.

The prosecution also presented evidence of the facts underlying defendant's manslaughter conviction. In 1992, defendant and Von Seggern lived together in a trailer park, and then Von Seggern moved into an apartment. She disappeared in October 1992. Her decomposed body, wrapped in a sleeping bag and bound, was found in an isolated area in Sonoma County on January 12, 1993. The pathologist who performed the autopsy could not determine the cause of death due to the decomposed state of the body. Among the evidence connecting defendant to the crime were his incriminating statements and evidence that after the victim disappeared, he sold her car (which contained bloodstains) and forged her name on documents to do so.

In early December 1998, Margaret Johnson, defendant's step-grandmother, who had a heart problem, died suddenly, due to ischemic heart disease. The prosecution presented evidence that after Johnson died, defendant set fire to her mobile home, badly burning the body. After Johnson's death, some of her property was found in defendant's possession; he also used one of her credit cards. He later admitted to the police that he had burglarized Johnson's home but expressed shock that the police wanted him for her murder.

Henni Ray, Salling's daughter, testified about Salling and the impact her death had on her family. Von Seggern's father testified about Von Seggern and the impact of her death.

## 2. Defense Evidence

Defendant's stepfather, Bryant Johnson, testified about defendant and his good qualities. Robert Fogelstrom, a Lake County correctional officer, testified that defendant had been a "model inmate" in jail. Mildred Mallory, who held church services in the Lake County Jail, testified that defendant had attended her services regularly and was always pleasant and never threatening. She said, "He accepted Christ as his savior. And I know when you become a Christian, you have a new nature, I know that."

Defendant testified. His grandmother, mother, and stepfather had raised him. He said he was addicted to methamphetamine, which he began using in high school.

Regarding his Arizona burglary conviction, he said that he and some friends had shoplifted beer and other items. He admitted grabbing Pamela Braden but denied "punch[ing] her like she said I did." Regarding Von Seggern's death, he testified that she was "slamming dope," they "got into a hassle," and he knocked her down. "She hit a table, and she stopped breathing. . . . I panicked. I proceeded to . . . put her in a sleeping bag. I tied her up, put her in a car, and I took her out, and I dumped her. It was callous. I wish I could take it back." He admitted burglarizing Margaret Johnson's home, taking her property, and using her credit card, but he denied seeing her when he was there and denied setting fire to her home. At the time, he "had been up straight solid" on methamphetamine, meaning he had not slept.

Defendant also testified about the crime of this case. He admitted killing Salling. He said he had been using methamphetamine heavily and continuously for several days before he did so and had gotten little sleep, which made him "really edgy" and caused him to "blow up at the slightest little thing." He knocked on Salling's door, holding a tree limb that he was using as a walking stick. He

8

only intended to use her telephone. He asked to use her telephone and she invited him in. Inside, because he looked like a "mess," she told him to "get out of my house." He started "violently shaking, trembling, uncontrollable," and he "attacked her." He could not remember the details of the killing. After killing Salling, he "panicked," went through her drawers, and stole her property. He decided to steal her property only after he killed her. He still had nightmares about what he did to her, and he goes to church "quite often" to pray for forgiveness.

Dr. Raymond Deutsch testified about methamphetamine and its effects on those addicted to it. In his opinion, defendant was addicted to the drug. Methamphetamine use distorts perception and can cause delusions and "rage reactions." In his opinion, defendant killed Salling as a result of a rage reaction and not due to a predetermined plan. Defendant's later actions in stealing her property were, in his opinion, not "part of the rage reaction at all; I think that happened after the rage reaction was completed."

## II. DISCUSSION

### A. Failure of the Trial Judge to Disqualify Himself

Defendant contends that the trial judge, the Honorable Robert L. Crone, should have disqualified himself because of his personal and professional relationship with the prosecutor, and Judge Crone's failure to do so violated various of his constitutional rights.

#### 1. Procedural Background

The prosecutor, Stephen Hedstrom, was the elected District Attorney of Lake County, but had also been elected to the Lake County Superior Court bench. He prosecuted this case as an acting deputy district attorney before he actually took the bench. On June 27, 2000, Judge Crone was assigned to this case for all

9

purposes. At the outset of the court hearing on that date, in defendant's presence, and before he did anything else, Judge Crone placed on the record information pursuant, he said, to the "provisions in the Code of Civil Procedure, 170, et seq. having to with disqualification of judges for various causes and reasons." He disclosed in detail his close professional relationship and personal friendship with Hedstrom.

Judge Crone disclosed on the record that he served as the elected District Attorney of Lake County from 1977 to 1984. During that time, Hedstrom was a deputy district attorney in the office, and he essentially ran the office for a period when Judge Crone was trying a case in another county. Eventually, on Judge Crone's advice and with his nonmonetary and "non-public" assistance, Hedstrom ran for, and was elected to, an open judicial position. After the election, Judge Crone and Hedstrom had various conversations regarding Hedstrom's upcoming judicial position.

Judge Crone also disclosed his close friendship with Hedstrom. "[W]e have basically been friends over a number of years. And there's never been a time, I have to say, when, after I went on the bench — obviously the relationship you have with people changes as to what you can do, what you can't do, what you can talk about, what you can't talk about. And there was never anything inappropriate about that whenever we met at social functions or whatever: Business was not the topic of conversation." After Hedstrom's election as a judge, "we got on maybe an even closer basis as a result of that, and — but there again, there's always a separation and a distance from what I do as a judge." Hedstrom had recently been a pallbearer at Judge Crone's mother's funeral.

Judge Crone concluded his comments: "So anyway, I just wanted everyone to know what the relationship had been. In my opinion it doesn't affect anything that I would do, but on the other hand, I feel compelled, as I understand the

10

responsibilities of a judge in this position, to make this disclosure. So with that, if there's — if this is new information, or information you haven't discussed with your client, whatever, I'd be happy to give you time, if you want a reasonable —."

Defense counsel interrupted to state: "Actually, just to let you know: Mr. Hedstrom and I had a conversation before your Honor took the bench about that very thing, and I talked to my client about it. As I explained to my client, I've practiced law in Fresno for 24 years; I've gone to law school with a couple of the judges; I've got a close personal relationship with a couple of the other judges, but I've never received a ruling from any of them that I didn't deserve, either for or against my position. And Mr. Hedstrom expects that the rulings from the bench will be fair and impartial for both of us. My client agrees; and so we are ready to go, your Honor." Defendant personally said, "Yes." Judge Crone said, "Okay," defense counsel thanked him for his "candor," and the hearing moved on to other matters.

Judge Crone presided over the case from that point on.

### 2. Analysis

Defendant now contends that rather than merely disclose this information, Judge Crone should instead have disqualified himself. However, after discussing the matter with defendant, and with his personal agreement, defense counsel agreed that Judge Crone could preside over the case. Under the circumstances, defendant may not raise this claim for the first time on appeal.

"If a judge refuses or fails to disqualify herself, a party may seek the judge's disqualification. The party must do so, however, 'at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification.' (Code Civ. Proc., § 170.3, subd. (c)(1).)" (*People v. Scott* (1997) 15 Cal.4th 1188, 1207.) "Defendant may not go to trial before a judge and

11

gamble on a favorable result, and then assert for the first time on appeal that the judge was biased." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 626.)[3]

We have allowed a defendant who objected to a judge's participation in the proceedings and merely failed to pursue the statutory appellate remedy under Code of Civil Procedure section 170.3, to raise on appeal a narrow due process claim. (*People v. Freeman* (2010) 47 Cal.4th 993, 999-1000; *People v. Chatman* (2006) 38 Cal.4th 344, 362-363; see *Caperton v. A.T. Massey Coal Co.* (2009) 556 U.S. 868 [establishing the standard for a due process claim that a judge was biased after the party making the claim had moved to disqualify the judge].) But a defendant who *never* objected to the judge may not do so. (*People v. Scott*, *supra*, 15 Cal.4th at p. 1207.) Defendant may not ""'"play fast and loose with the administration of justice"'"" by agreeing to have Judge Crone preside over the case and claiming later that he was biased. (*Ibid*., quoting *Caminetti v. Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 386, 392.) Accordingly, defendant may not argue on appeal that Judge Crone was biased when, at the outset and after full disclosure, he agreed the judge was not biased.

Defendant suggests he was not properly admonished about his right to an unbiased judge. But he was present during the hearing when Judge Crone made the disclosures and had previously discussed the situation with his attorney, after

<hr />

[3] Code of Civil Procedure section 170.3, subdivision (b)(1), provides: "A judge who determines himself or herself to be disqualified after disclosing the basis for his or her disqualification on the record may ask the parties and their attorneys whether they wish to waive the disqualification, except where the basis for disqualification is as provided in paragraph (2). A waiver of disqualification shall recite the basis for the disqualification, and is effective only when signed by all parties and their attorneys and filed in the record." This provision does not apply here because Judge Crone neither determined himself to be disqualified nor asked the parties whether they wished to waive any disqualification.

which he personally expressed agreement with his attorney's belief that Judge Crone would be fair. In any event, because he was represented by counsel, defendant's personal waiver was not required. "'"When the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of 'fundamental' personal rights to *counsel's* complete control of defense strategies and tactics,"'" including deciding whether to challenge a judge. (*People v. Scott*, *supra*, 15 Cal.4th at p. 1207, quoting *In re Horton* (1991) 54 Cal.3d 82, 95 [counsel may implicitly stipulate to trial before a court commissioner].)

Defendant contends his attorney provided ineffective assistance by not objecting to Judge Crone. "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Scott, supra*, 15 Cal.4th at p. 1211.) Defendant has not made this showing.

In reviewing a claim of ineffective assistance of counsel, we give great deference to counsel's tactical decisions. (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) Deciding whether to object to a judge is inherently tactical. "'There are, no doubt, an infinite number of reasons why counsel would not avail themselves of the opportunity to disqualify a judge. The failure to do so is within the competence of counsel, and does not show ineffective counsel.'" (*People v. Scott, supra*, 15 Cal.4th at p. 1213, quoting *People v. Beaumaster* (1971) 17 Cal.App.3d 996, 1009 .) Defense counsel was satisfied that Judge Crone would be fair. We have no basis to second-guess this tactical decision. As counsel noted when he

13

accepted Judge Crone, friendship between a judge and an attorney who appears before the judge occurs routinely. (See *People v. Carter* (2005) 36 Cal.4th 1215, 1243.) This is especially true in small counties. This case is unusual in that the prosecutor was soon to become a judicial colleague of the judge. But Judge Crone made clear, and defendant agreed, that the relationship between him and the prosecutor would not affect his conduct of the case. Deciding not to challenge Judge Crone came within the range of tactical decisions competent counsel may make.

Accordingly, we need not decide whether Judge Crone should have disqualified himself had defendant so requested.

Defendant also contends that, in fact, Judge Crone's relationship with the prosecutor affected some of his later rulings. He never objected on this basis. Accordingly, he has also "forfeited his additional claims that the trial court's alleged bias affected his subsequent trial rulings." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111.) Moreover, nothing in the record supports the contention.

Defendant asserts that Judge Crone denied a change of venue to avoid delaying the trial so that Hedstrom might become a judge all the sooner. The record reflects that in hearings held in front of *other* judges before Judge Crone was assigned the case, the prosecutor was concerned about potential delays. Defendant claims that the record of one such hearing before another judge, on May 3, 1999, shows the "eagerness of prosecutor Hedstrom to proceed to trial as he had been elected judge and could not assume judicial office until conclusion of trial." But the record does not support the claim. The hearing that defendant cites occurred before the preliminary examination was held. The public defender made a "special appearance" on defendant's behalf solely to ask for a delay so another attorney could be appointed to represent defendant, a request that would cause defendant to be unrepresented for the time being. Hedstrom expressed concern

14

about defendant's being unrepresented because of time considerations under section 859b.[4] He said he was "highly concerned that, given the requirement of the preliminary hearing within 10 court days, that we are running into problems." He noted that the "stakes are extremely high in this case, and it does not seem unreasonable for the People to request that there be some attorney that actually appears in court on this case in a timely fashion." The court (not Judge Crone) ordered the attorney who was to be appointed to appear in court the next day. Given section 859b's tight time limits within which to hold the preliminary examination, with dismissal a potential sanction if those limits were not met, the prosecutor's wanting to protect the case in this way was neither inappropriate nor suspicious. The same is true of later occasions defendant cites that show the prosecutor wanted to bring the case to trial within a reasonable time. Trial began more than a year and a half after defendant's arrest, which does not suggest undue haste.

But even if we were to assume, with no support in the record, that the prosecutor wanted to try the case promptly for personal reasons, nothing suggests Judge Crone did anything to aid him in this regard. As discussed *post*, defendant moved to change venue from Lake County. On appeal, he asserts that "the record shows that even before the change of venue motion had been fully heard or argued, Judge Crone had already decided the issue and fully intended to deny change of venue to benefit the prosecutor." Again, the record does not support the

---

[4]    Section 859b gives the defendant (and people) the right to a preliminary examination "within 10 court days of the date the defendant is arraigned or pleads, whichever occurs later," unless the right is waived or good cause for a continuance is found. If, as was the case here, the defendant is in custody, the section further requires the magistrate to dismiss the complaint if the preliminary examination is not timely held unless the defendant waives the time limits.

15

assertion. Defendant claims that a hearing held after defendant had filed the change of venue motion, but before it had been heard, showed that "Judge Crone was already discussing with counsel a trial schedule in Lake County, implying that he already had decided the issue before it was heard or submitted and intended to deny a change of venue." But the hearing defendant cites was held in front of a different judge *before* Judge Crone was assigned the case. At that hearing, the parties and court (not Judge Crone) discussed scheduling, including when to hold the hearing on the change of venue motion and when to schedule trial *in the event a change of venue were denied*. The hearing does not suggest anyone had prejudged the motion, much less Judge Crone, who had not yet been assigned the case.

As defendant notes, the record also reflects that during the hearing on the motion to change venue, and before ruling on it, Judge Crone and the parties sometimes discussed scheduling and trial procedures. But all such discussion was predicated on trial actually being held in Lake County. Judge Crone specifically stated that the discussion of scheduling was "without prejudice" to the motion to change venue, and he noted that "if venue is transferred, it may not work." Discussing scheduling and other trial matters in the event venue was not changed did not show prejudgment.

The record shows that Judge Crone was fair and impartial in his rulings and conduct of the case.

### B. Denial of Change of Venue Motion

On May, 30, 2000, defendant moved to change venue from Lake County, citing extensive pretrial publicity about the case. After he was assigned to the case, Judge Crone presided over a lengthy evidentiary hearing at which both sides presented the testimony of their respective experts and the results of public

16

opinion polls each expert had conducted. After the hearing, the court denied the motion in a detailed oral ruling. It stated that the "denial is without prejudice to renew the motion during the jury selection, should actual experience in trying to select a jury so justify." Defendant neither renewed the motion nor exhausted his peremptory challenges.

Defendant contends the court prejudicially erred in denying the motion in violation of various constitutional rights. "Because he did not renew his motion after voir dire, the claim is forfeited. (*People v. Hart* (1999) 20 Cal.4th 546, 598.)" (*People v. Hensley* (2014) 59 Cal.4th 788, 796.) Defendant asserts that the "trial court never gave any indication that [his] change of venue motion would again be addressed or reconsidered by the court during or following jury selection." But the record is to the contrary. As noted, the trial court expressly stated that the denial was without prejudice to renewing the motion during jury selection. Based on his argument, discussed *ante*, that Judge Crone had prejudged the change of venue motion, defendant also argues that any renewal of the motion would have been futile. But, as we also discussed, the record does not support any claim that the judge had prejudged the motion. Nothing in the record suggests the court would not have fairly considered any renewed motion to change venue during jury selection. Because he chose not to renew the motion, defendant has forfeited the claim.

Moreover, the claim lacks merit. To prevail on appeal, "a defendant challenging the court's denial of a change of venue must show both error and prejudice, that is, that it was not reasonably likely the defendant could receive a fair trial at the time of the motion, and that it is reasonably likely he did not in fact receive a fair trial." (*People v. Rountree* (2013) 56 Cal.4th 823, 837.) To decide whether the trial court erred in denying a change of venue, we consider "several factors, including the nature and gravity of the offense, the nature and extent of the

17

media coverage, the size of the community, the defendant's status within the community, and the victim's prominence." (*People v. Avila* (2014) 59 Cal.4th 496, 507.) In this case, we need not decide whether the court erred in denying a change of venue because defendant cannot show prejudice. This is not "an extraordinary case in which the publicity was 'so pervasive and inflammatory' that prejudice is presumed and the jurors' assurances of impartiality should not be believed." (*People v. Hensley*, *supra*, 59 Cal.4th at p. 796.)

"Defendant has not established that it is '"reasonably likely that a fair trial was not in fact had."'" (*People v. Proctor* (1992) 4 Cal.4th 499, 523, italics omitted; see *Beck v. Washington* (1962) 369 U.S. 541, 556 [no 'constitutional infirmity' in denying a change of venue motion 'if petitioner actually received a trial by an impartial jury'].)" (*People v. Hensley*, *supra*, 59 Cal.4th at p. 796.) Defendant argues that four of the actual jurors and the three alternates "had been exposed to pretrial publicity, were aware of the facts or circumstances of the charged murder, and many had personal acquaintance with the trial judge, parties or witnesses, suggesting emotional bias and prejudgment." None of the alternate jurors participated in either the guilt or penalty verdict, so any knowledge of the case they might have had could not have prejudiced defendant. (See *People v. Edwards* (2013) 57 Cal.4th 658, 746.) In any event, all of these jurors had minimal pretrial exposure to this case. More importantly, each assured the court, to the court's (and apparently defendant's) satisfaction, that "they could put aside any pretrial publicity and decide the case solely on the evidence at trial." (*Hensley*, at p. 796.)

Specifically, Juror No. 200034886 stated on the jury questionnaire that she had known defendant's girlfriend, Starlene Parenteau, and that she had read "a short newspaper article in the Record Bee a few weeks before being called as a juror. Sketchy details — do not remember much about it." During voir dire, she

18

said that Parenteau's son had been one of her students, and she did not approve of the way Parenteau had "dealt with her son." But she assured the court this disapproval would not affect her ability to judge her credibility. All that she could remember about the case was "something about Kono Tayee" and "[s]omething involving a car chase." She also said she "possibly" knew the Johnson family. She did not know "which Johnson family it is," and "not being able to talk to anybody about it I couldn't clear it up." Specifically, she said when she was a child she had known of a "Brad Johnson that owned a hardware store." The court said it did not know if he were any relation and asked if it would make any difference. She responded, "No, just a childhood memory." She said she had formed no opinion about the case and would put aside anything she had heard about it and decide it based solely on the evidence presented at trial.

Juror No. 200012964 stated on the questionnaire that she had heard of the case "only in the paper as it happened. My husband said, at that time, that he knew the victim's son-in-law, as a customer." During voir dire, she said that "months ago," she had read an article in the Clearlake Observer. Her husband never mentioned the son-in-law's name, and she never had any contact with him. What she remembered about the case was that a "[w]oman was found in her Kono Tayee home killed and her car was gone." The only opinion she ever expressed about the case was that "it was horrible that someone was killed." She assured the court that she could set aside anything she had heard of the case and decide it based solely on the evidence presented at trial.

Juror No. 200010689 stated on the questionnaire that she was "acquainted" with a few of the prospective witnesses and had "read the local papers when [the crime] occurred." During voir dire, she said she had met the witnesses in her work for a veterinarian. Her acquaintance with them would not affect her ability to judge their credibility. She had read "maybe one or two" articles about the case

19

when it occurred, but "it didn't catch my interest sufficiently to scour it." All she remembered was "a house being broken into in the Kono Tayee area, and a lady was killed." "It didn't connect my interest. But I generally read what's in front of me, so — and I have no real long memories of any of it." She had never expressed any opinion about the case. She assured the court that she could set aside anything she knew or remembered about the case and decide it based solely on the evidence presented at trial.

Juror No. 200002006 stated on the questionnaire that he had read about the case "in the papers at the time of the crime." During voir dire, he said he could not remember much about the case: "I just . . . read the article and really didn't pay too much attention." He remembered "reading that there was a killing, a murder, and that was about it. You know, I didn't know the person, so I didn't pay much attention." He did not remember ever discussing the case with anyone and said nothing he had read would prevent him from being fair to both sides. He assured the court he could set aside whatever he had read or remembered about the case and decide it based solely on the evidence presented at trial.

Alternate Juror No. 200002970 stated on the questionnaire, "I might have seen [this case] in the local papers. I read them most of the time." During voir dire, he said he had no present recollection of actually reading or hearing about the case. He assured the court that even if later he were to remember anything about the case, he would decide it based solely on the evidence presented at trial.

Alternate Juror No. 200019102 stated on the questionnaire that he knew Judge Crone, but he had heard nothing about the case. During voir dire, he said his knowledge of Judge Crone would not affect his ability to be fair to both sides. He assured the court that if he later remembered anything about the case, he would put it aside and decide it based solely on the evidence presented at trial. On questioning by defense counsel, he explained that Judge Crone's "mother was a

20

tenant on a property that I managed, and so I would see him and his mother. And his mother was good friends with my wife's mother." He added that he had "lived there since 1978, and we're a small community, so you know a lot of people." He said he never "talk[ed] shop" with Judge Crone, and he would not view anything the judge did as favoring either side.

Alternate Juror No. 200014476 stated on the questionnaire that on four or five occasions before he had been summoned as a juror he had "provided transportation" as a cab driver to one of the defense attorneys in the case. He had heard about the case "only that a woman was killed in Kono Tayee — no names or specifics from a co-worker at my place of employment." He added that "no specifics were ever discussed with [the defense attorney]. After receiving my summons there has been no association." During voir dire, he said he knew Jeff Biddle because "he's my cousin's son. I probably seen him five times in my whole life." His relationship to Biddle would not affect him or his ability to judge his credibility should he testify. (Biddle never actually testified, although he played a minor role in these events. (See *ante*, pp. 5-6.)) The juror's acquaintance with the defense attorney would not "play any part." His only knowledge of the case was what he had heard from a coworker. Someone told him that the victim was the grandmother of someone he knew of at work. That was all he remembered of the case. He assured the court that he would put aside anything he had heard or remembered about the case and decide it based solely on the evidence presented at trial.

Shortly after the evidence portion of trial began, this same alternate juror sent the court a note stating that he knew Jeff Biddle and Shiree Hardman. The note added, "Can assure the court this will have no effect on me or any decision I will make should I become a member of the jury as opposed to an alternate. Can assure the court I have had no conversations with either person concerning any

21

matter involved with any subject in this case." The note also stated he knew "a Charlie Farmer" although he had had no contact with him for over 25 years. After reading the note for the record, the court stated, "If anybody wanted to inquire further, I'd be happy to have him come out and inquire." Defense counsel responded, "It's not necessary."

Nothing in the juror questionnaires or voir dire indicates that any of these jurors had formed an opinion regarding defendant's guilt or were otherwise biased against him. "Although a preexisting opinion is not disqualifying if the juror can set the opinion aside and decide the case solely on the evidence presented in court [citation], these jurors did not even present that issue." (*People v. Avila*, *supra*, 59 Cal.4th at p. 512.) A few of the jurors were slightly acquainted with some of the potential witnesses or had heard of the victim or her family, but nothing suggests this would bias them.

Defendant claims that during voir dire, the "jurors were not asked questions which were calculated to elicit the disclosure of the existence of actual prejudice, the degree to which the jurors had been exposed to prejudicial publicity, and how such exposure had affected the jurors' attitude towards the trial. [Citation.] Instead, leading questions and conclusionary answers were typical of the manner in which [the] voir dire was conducted." He did not object on this basis, so the contention is forfeited. (*People v. Freeman* (1994) 8 Cal.4th 450, 487.) Moreover, the record is to the contrary. The court carefully inquired into these matters and allowed both parties to ask any additional questions they wished. The two examples defendant cites to support his claim do not do so.

First, defendant asserts that the "court simply asked" one of the jurors, "'you don't believe you've read or heard anything about this case before coming to court; is that true?'" But defendant quotes the record selectively in a manner that distorts it. The juror in question had stated on the questionnaire that he knew

22

none of the participants and had heard nothing about the case. During voir dire, the court asked the juror about the questionnaire, including this question: "*And you answered the question that* you don't believe you've read or heard anything about this case before coming to court; is that true?" (Italics added to indicate language defendant's quotation omitted.) The juror responded, "I haven't heard anything about it at all." He was then asked follow-up questions about newspapers he took. He replied that he took two newspapers, and was further asked, "Do you feel you've read anything in either of those papers that might be connected to this case?" The juror replied, "No, I haven't." Another follow-up question on this point elicited another negative response, then the questioning went on to other matters. Defense counsel later questioned this juror extensively, although not on this point. Thus, in response to specific questions, the juror repeatedly stated he knew nothing about the case. Reasonably, the court and parties did not ask more questions on the point.

Second, defendant asserts the court asked Juror No. 200012964 "whether 'she could set aside anything that you feel you've read that's connected with this case or heard about this case' even though [the] juror had previously expressed [the] opinion to others, based on pretrial exposure to newspaper articles, that 'it was horrible that someone was killed.' " The quoted question alone seems fair and adequate, but in fact the questioning was substantially more extensive than this.

The court explained, and the juror specifically stated that she understood, that "a juror can only make a decision in a case based on the evidence that's produced here in the courtroom." Next, the court explained, and the juror specifically stated that she understood, that "anything that a person may have read in a newspaper or have discussion with somebody outside the courtroom, that can't be used as any part of a basis of any decision that the juror might make in a

23

case." The court then asked the juror to state "in as great [a] detail" as she could what she remembered reading about the case and received the answer set forth in the earlier discussion of that juror's voir dire statements. Then the court asked the question that defendant quotes in part: "And could you set aside anything that you feel you've read that's connected with this case or heard about this case and decide this case solely on the evidence produced here in the courtroom?" The juror responded that she could. The court then explored the matter further. As it typically did throughout the voir dire, the court explained, and specifically ascertained that the juror understood, that sometimes something occurs that might trigger more memories about the case. The court then asked, "And you'd have to assure the Court that if such a thing did happen that you'd set aside anything that you may have heard or read outside the courtroom and decide the case solely on the evidence that's produced here in the courtroom. Could you do that?" The juror responded, "Yes." The court then asked whether the juror had "ever express[ed] any opinions to anyone about this case," eliciting the response, "Just that it was horrible that someone was killed." Defendant questioned the juror extensively, although he asked no questions on this point.

The questioning was fully adequate to explore the jurors' knowledge of the case and any impact this knowledge would have on their ability to be fair. Defendant never claimed otherwise at trial. "Defendant's failure to exhaust his peremptory challenges or renew his venue motion supports 'a reasonable inference that the defense did not believe that pretrial publicity had prejudiced the seated jurors . . . .'" (*People v. Hensley*, *supra*, 59 Cal.4th at p. 796, quoting *People v. Prince* (2007) 40 Cal.4th 1179, 1216.)

### C. Sufficiency of the Evidence Regarding Carjacking

Defendant contends the evidence was insufficient to support the carjacking conviction, a first degree murder conviction predicated on the felony-murder rule based on carjacking, and the carjacking-murder special circumstance.

"To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt." (*People v. Rountree*, *supra*, 56 Cal.4th at pp. 852-853.) This standard of review applies when the evidence is largely circumstantial and to review of special circumstance findings. (*People v. Kelly* (2007) 42 Cal.4th 763, 788.)

"Section 215, subdivision (a), defines carjacking as 'the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear.' " (*People v. Hill* (2000) 23 Cal.4th 853, 858-859.) "The Legislature recently made carjacking a separate crime, and for a good reason. '[C]arjacking is a particularly serious crime that victimizes persons in vulnerable settings and, because of the nature of the taking, raises a serious potential for harm to the victim, the perpetrator and the public at large.'" (*Id.* at p. 859, quoting *People v. Antoine* (1996) 48 Cal.App.4th 489, 495.)

Defendant makes two distinct factual arguments regarding the carjacking conviction. First, he argues there was insufficient evidence that he intended to take the victim's car before he killed her, i.e., before he used force or fear.

25

Second, he argues there was insufficient evidence he took the car from the victim's person or immediate presence. Both arguments lack merit.

Whether defendant intended to steal the victim's property before he killed her was disputed at trial, indeed was virtually the only contested guilt issue. Defendant does not challenge the jury's finding that he intended to steal some property before he killed the victim. The jury could readily conclude defendant intended to steal when he entered the victim's house with a weapon and beat her to death. It did not have to conclude he killed the victim for no apparent reason and only then decided to steal. When one kills and then takes substantial property from the victim, a reasonable jury can ordinarily find the killing was for the purpose of taking the property. (*People v. Kelly*, *supra*, 42 Cal.4th at p. 788.) "Murders are commonly committed to obtain money or other property." (*Ibid*.)

Rather than make the more general argument, defendant argues specifically that the evidence was insufficient for the jury to find he intended to take the victim's *car* before he killed her. However, a reasonable jury could have concluded that after defendant had walked five miles from where he had crashed his van, what he needed most was another vehicle to escape from the area, and that he intended to steal that vehicle. Defendant claims there was no evidence he knew this particular victim had a car. But the jury could reasonably have found that in this residential neighborhood, with which defendant was familiar, most residents possessed a vehicle of some kind. Additionally, it could reasonably have concluded that defendant believed, or at least hoped, that the victim's residence, in particular, contained a car. It had, after all, a garage. If defendant had a doubt, he could easily have glanced into the garage and seen the car. The jury could reasonably conclude that defendant would not have selected this particular home to enter if he did not believe it had a car to satisfy his most pressing need. Defendant did take the car and did use it to try to escape from law enforcement.

26

From all of this evidence, a reasonable jury could readily conclude defendant entered the house not merely to kill but to take the victim's property, including, perhaps above all, the car.

The evidence was also sufficient for the jury to conclude defendant took the car from the victim's "person or immediate presence." (§ 215, subd. (a).) This requirement for carjacking is similar to the equivalent requirement for robbery. Due to differences in the statutory elements, the analogy between carjacking and robbery is imperfect. (*People v. Hill*, *supra*, 23 Cal.4th at p. 860.) However, the "Legislature modeled the carjacking statute on the robbery statute," and some of the language in the carjacking statute (§ 215) tracks that of the robbery statute (§ 211). (*People v. Lopez* (2003) 31 Cal.4th 1051, 1059.) Specifically, both section 211 and section 215 require a taking from the "person or immediate presence" of the person. (See *Lopez*, at p. 1059; *People v. Coleman* (2007) 146 Cal.App.4th 1363, 1369-1370.)

We have approved of the Massachusetts Supreme Court's definition that something is in a person's "immediate presence" if it is "'"'so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.'"'" (*People v. Hayes* (1990) 52 Cal.3d 577, 626-627, quoting *Commonwealth v. Homer* (1920) 235 Mass, 526, 533 [127 N.E. 517].) "Under this definition, property may be found to be in the victim's immediate presence 'even though it is located in another room of the house, or in another building on [the] premises.'" (*Hayes*, at p. 627.) Or, as the Court of Appeal recently said, "A vehicle is within a person's immediate presence for purposes of carjacking if it is sufficiently within his control so that he could retain possession of it if not prevented by force or fear." (*People v. Gomez* (2011) 192 Cal.App.4th 609, 623.)

27

Here, the victim's car was in her garage, only separated from the kitchen by a breezeway. Normally, in order to accomplish a carjacking, the perpetrator must take not only the car itself but the keys to the car. Witnesses who knew Salling well testified that she normally kept her car keys on a kitchen counter or in her purse or in a dish that were on the counter. Cookie dough and a mixer were on a kitchen counter after Salling's death, indicating she was in the kitchen baking cookies. Police found blood throughout the house, including blood smears on the kitchen counter, indicating that defendant took the keys (and other property) after he killed Salling. Thus, the jury could reasonably find that the car keys were within the victim's immediate reach at the time defendant arrived at her door, and defendant took the keys from where she had been. All of this evidence supports a jury finding that the victim could have retained possession of her keys and car had defendant not prevented her from doing so by force or fear — in this case, deadly force.

In *People v. Hoard* (2002) 103 Cal.App.4th 599, the defendant entered a jewelry store and, displaying a gun, demanded car keys from one of the store employees. He later took the employee's car, which was parked outside in a parking lot. (*Id*. at pp. 602, 608.) Although recognizing that these facts did not present "the 'classic' carjacking scenario," the Court of Appeal held that the crime "was a carjacking all the same." (*Id*. at p. 609, fn. omitted.) It explained that "the elements of carjacking were established. Defendant took possession of [the victim's] car by threatening her and demanding her car keys. Although she was not physically present in the parking lot when he drove the car away, she had been forced to relinquish her car keys. Otherwise, she could have kept possession and control of the keys and her car." (*Ibid*.)

The same is true here. This might not be a classic carjacking such as when the perpetrator approaches a car stopped at a red light and, at gunpoint, forces the

driver and any passengers out, then drives the car away. But all of the statutory elements of carjacking are met. Moreover, the facts come within the statute's purpose. Because the keys were in the house (or so the jury could reasonably find), someone who wanted to drive the car could not easily do so surreptitiously by simply entering the garage and driving away. The person had to enter the house to get the keys. The victim, Salling, was particularly vulnerable when defendant knocked on her door intending to take her car, and she answered it. It appears defendant did not demand the keys from Salling, as in *People v. Hoard*, *supra*, 103 Cal.App.4th 599, but instead killed her so he could take the keys and drive her car away. This was certainly using force to accomplish the taking. The nature of the taking — entering a private home to obtain car keys inside that home in order to use a car in the garage as a getaway — raised a very serious potential for harm to the victim (here, fatal harm), the perpetrator (defendant crashed the car), and the public at large (a high-speed chase is very dangerous). (See *People v. Hill*, *supra*, 23 Cal.4th at p. 859.) The jury could have reasonably found that this was a carjacking.

*People v. Coleman*, *supra*, 146 Cal.App.4th 1363, cited by defendant, is distinguishable. In that case, the owner of a Chevrolet Silverado parked it in front of his business establishment, left his keys in the shop, and left. The defendant later entered the business establishment, forced the office manager to give him the keys to the car, and then drove away in the car. The office manager owned neither the car nor the keys. The Court of Appeal found insufficient evidence to support a conviction that the defendant was guilty of carjacking the Silverado. As explained in *Gomez* in distinguishing that case, although the *Coleman* "court 'acknowledge[d] that a carjacking may occur where neither the possessor nor the passenger is inside or adjacent to the vehicle,' the circumstances in this case were 'simply too far removed from the type of conduct that [the carjacking statute] was

29

designed to address.' [(Citing *Coleman*, at p. 1373.)] The office manager, the court explained, 'was not within any physical proximity to the Silverado, the keys she relinquished were not her own, and there was no evidence that she had ever been or would be a driver of or passenger in the Silverado.' (*Ibid.*)" (*People v. Gomez*, *supra*, 192 Cal.App.4th at pp. 624-625.)

This case is very different. The murder victim owned the keys and the car, she was physically close to both, and the jury could have reasonably found she could have retained possession of both had defendant not killed her.

The concurring and dissenting opinion recognizes that in defining "carjacking," the Legislature employed the same statutory phrase, "immediate presence," used to define robbery. But it argues the phrase has a different meaning for carjacking than for robbery — apparently something like, "directly relat[ing] to the victim's contemporaneous use of the vehicle." (Conc. & dis. opn., *post*, at p. 5.) If the Legislature had intended such a meaning, it could easily have said so. But it did not use any such language; rather it employed the oft-interpreted legal term, "immediate presence." The language the Legislature employs is the best indicator of its intent. (*People v. Cook* (Feb. 5, 2015, S215927) 60 Cal.4th __, __ [p. 17].) The Legislature enacted the carjacking statute in 1993, some three years after we definitively interpreted the phrase "immediate presence" in *People v. Hayes*, *supra*, 52 Cal.3d at pages 626-628. (Stats. 1993, ch. 611, § 6, p. 3508.) We presume that when the Legislature employs words that have been judicially construed (and especially so recently), it intends the words to have the meaning the courts have given them. Indeed, we have described this presumption as " ' 'almost irresistible.' " ' (*People v. Weidert* (1985) 39 Cal.3d 836, 845.)

The concurring and dissenting opinion relies almost exclusively on committee reports that suggest carjackings like the one here were not the

30

Legislature's primary target. But nothing in the reports indicates the Legislature intended to *limit* carjackings to the examples the reports give and to exclude conduct, like that here, that comes within the statute's plain language. Nor could the reports do so. Committee reports, often drafted by unelected staffers, cannot alter a statute's plain language. (*Martinez v. Regents of University of California* (2010) 50 Cal.4th 1277, 1293.) Section 215's "actual language prevails, not the committee's report." (*Martinez*, at p. 1293.)

Defendant's argument regarding the felony-murder rule is based on his argument regarding the carjacking itself. If, as we have explained, a jury could reasonably find defendant committed carjacking, it could also find that he killed the victim "in the perpetration of, or attempt to perpetrate" that carjacking. (§ 189.) "Under the felony-murder rule, a strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the felony and murder were part of one continuous transaction." (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) The jury could reasonably find that defendant killed the victim to commit the crime of carjacking (as well as burglary and robbery), a finding that supports the additional finding that the carjacking and murder were part of one continuous transaction for purposes of the felony-murder rule. "Here, the jury could reasonably find defendant went to the house to steal [and carjack] and killed while doing so." (*People v. Horning* (2004) 34 Cal.4th 871, 903.)

Defendant's argument regarding the carjacking-murder special circumstance is also largely, although not entirely, predicated on his argument that the evidence was insufficient to support the carjacking conviction. He argues additionally that the carjacking was "merely incidental" to the murder. He is correct that "for the felony-murder special circumstance to apply, the felony 'must not have been merely incidental to the killing.' " (*People v. Horning*, *supra*, 34

31

Cal.4th at p. 904.) Here, however, a reasonable jury could have concluded that defendant's intent to take the car was his "primary — or at least concurrent — motivation, and that he killed to facilitate the stealing" and, in this case, carjacking. (*Ibid.*)

Substantial evidence supports defendant's conviction of carjacking, of murder based on the felony-murder rule with carjacking the underlying felony, and the carjacking-murder special-circumstance finding. Accordingly, we need not consider defendant's other arguments concerning the consequences of any insufficiency in the evidence.

### D. Instructions Regarding the Victim Impact Evidence

At the penalty phase, the prosecution presented victim impact evidence regarding Ellen Salling, the capital murder victim, and Jennifer Von Seggern, the victim of one of his earlier crimes. The evidence regarding Salling was admissible as evidence of the circumstances of the charged crime under section 190.3, factor (a). (*People v. Jones* (2012) 54 Cal.4th 1, 68.) The evidence regarding Von Seggern was not admissible under that factor, because factor (a) relates only to the charged offense. But it was admissible under section 190.3, factor (b) (violent criminal activity). (*Jones*, at p. 68; see *People v. Sattiewhite* (2014) 59 Cal.4th 446, 480; *People v. Davis* (2009) 46 Cal.4th 539, 617-618.)

Recognizing this, defendant does not contend the court erred in admitting the evidence. Rather, he contends it erred in not adequately instructing the jury on how it should consider the evidence. He argues that "the jury was not given any guidance as to how the two types of victim impact evidence should be evaluated in determining penalty. Instead, the jury was permitted to consider victim impact evidence in a purely discretionary and arbitrary manner, untethered to any statutory and constitutional mandates or requirements."

32

The Attorney General contends defendant has forfeited the contention because he did not request such instructions at trial. "A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) However, even without a request, a defendant may argue the court erred in instructing the jury "if the substantial rights of the defendant were affected thereby." (§ 1259.) Defendant contends the additional instructions were necessary to adequately instruct the jury on its deliberative process. If he were correct (as we explain, he is not), error in not giving the instructions would have affected his substantial rights. Accordingly, the claim is not forfeited. (*Hillhouse*, at p. 503.) We have rejected similar arguments on the merits without finding the argument forfeited. (*People v. Famalaro* (2011) 52 Cal.4th 1, 38-39.)

However, the contention lacks merit. We have repeatedly rejected the claim that the court had to give, even on request, additional instructions regarding victim impact evidence — both that offered under section 190.3, factor (a), and that offered under section 190.3, factor (b) — in addition to the standard instructions the court gave in this case. (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 483-484; *People v. Hartsch* (2010) 49 Cal.4th 472, 510-511; *People v. Davis*, *supra*, 46 Cal.4th at p. 623; *People v. Carey* (2007) 41 Cal.4th 109, 134.) We continue to reject the argument that additional instructions were required.

### E. Treatment of One of Defendant's Prior Crimes

Defendant was convicted by a no contest plea of the voluntary manslaughter of Jennifer Von Seggern. He had originally been charged with her murder, but the murder charge was dismissed as part of the no contest plea. At the penalty phase, the prosecution proved the prior conviction under section 190.3,

33

factor (c) (prior felony conviction), and presented evidence of the underlying facts under section 190.3, factor (b) (violent criminal activity). Defendant stated he had no objection to admitting evidence of the underlying facts.

Citing *People v. Jones* (1998) 17 Cal.4th 279 and *People v. Kaurish* (1990) 52 Cal.3d 648, the prosecutor stated his intent to introduce evidence that Von Seggern's killing was a more serious crime than voluntary manslaughter, and he requested the court to instruct the jury on the elements of murder regarding the case. Defense counsel said he had no objection to the court's instructing on murder but, because the defense intended to point out to the jury that defendant had been convicted only of manslaughter, he also asked the court to instruct on manslaughter. He stated he had no objection to "dealing with the idea that voluntary manslaughter is a plea bargain from a murder charge. In fact, we'd like to have the opportunity to argue that to the jury ourselves." Later, at the urging of both parties, the court agreed to instruct the jury on both manslaughter and murder regarding the Von Seggern case.

The prosecutor argued to the jury that the Von Seggern killing was murder. The court instructed the jury that evidence had been introduced to show defendant had committed the "murder or voluntary manslaughter or involuntary manslaughter" of Von Seggern, and it instructed on the elements of each of these crimes.

Defendant contends the court erred by permitting the prosecution to "retry" the Von Seggern killing and giving the murder instructions. The Attorney General contends defendant has forfeited the contentions. He did forfeit any contention regarding the evidence and the prosecutor's jury argument. (Evid. Code, § 353, subd. (a); *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1052, 1060.) Defendant claims that any objection would have been futile, thus excusing his failure to object. But nothing in the record supports the claim. Defendant may,

34

however, argue that the *instructions* affected his substantial rights. (§ 1259; *People v. Jones*, *supra*, 17 Cal.4th at p. 312.)

Defendant argues that his attorneys were ineffective for not objecting. We need not decide whether defendant's failure to object was tactical or simply a recognition that he had no valid objection to make, for his contentions lack merit. At the time of the trial, the propriety of what occurred was firmly established, and it remains so today. We have long and repeatedly rejected defendant's arguments.

Section 190.3 prohibits evidence at the penalty phase of criminal activity "for which the defendant was prosecuted and acquitted." Defendant argues that, because the murder charge was dismissed when he pleaded no contest to manslaughter, permitting the prosecutor to argue that the crime was murder and giving murder instructions violated this prohibition. However, dismissal of charges is not an acquittal for these purposes. "We have strictly limited this statutory notion of an acquittal to a *judicial determination on the merits of the truth or falsity* of the charge." (*People v. Stitely* (2005) 35 Cal.4th 514, 563; see *People v. Monterroso* (2004) 34 Cal.4th 743, 777.) "[A] dismissal not based on any judicial determination with respect to the truth or falsity of the charge is not an acquittal under section 190.3." (*People v. Heishman* (1988) 45 Cal.3d 147, 193; see *People v. Kaurish*, *supra*, 52 Cal.3d at p. 703.) This rule applies when, as here, a charged greater offense is dismissed after the defendant pleads guilty to a lesser included offense. "Pursuant to the doctrine of implied acquittal, a defendant's conviction of a lesser degree or lesser included offense of that charged constitutes an implied acquittal of the greater offense. Nonetheless, a dismissal, whether or not pursuant to a plea agreement, is not the equivalent of, and does not constitute, an acquittal pursuant to section 190.3." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1375.)

35

Defendant contends that the proscription against double jeopardy and principles of collateral estoppel and res judicata barred the state from retrying the manslaughter conviction. However, these doctrines do not apply here because defendant was not retried for the past crime. "The presentation of evidence of past criminal conduct at a sentencing hearing does not place the defendant in jeopardy with respect to the past offenses. He is not on trial for the past offense, is not subject to conviction or punishment for the past offense, and may not claim either speedy trial or double jeopardy protection against introduction of such evidence." (*People v. Visciotti* (1992) 2 Cal.4th 1, 71; see *People v. Danielson* (1992) 3 Cal.4th 691, 720 [rejecting similar arguments regarding evidence of a past killing that showed malice or premeditation when the defendant had been convicted of voluntary manslaughter for the killing]; *People v. Melton* (1988) 44 Cal.3d 713, 756, fn. 17.)

Defendant also argues that, because he was convicted only of voluntary manslaughter for the Von Seggern killing, the court should not have instructed the jury on the elements of murder regarding that crime. We disagree. In *People v. Jones*, *supra*, 17 Cal.4th 279, the defendant had admitted in juvenile court that he had committed a misdemeanor battery in an incident at his high school in 1986. At his subsequent capital trial, the prosecution presented evidence of the underlying facts of that incident, and the court instructed the jury that it could consider whether the defendant had committed assault by means likely to cause great bodily injury, a potential felony. (*Id*. at pp. 311-312.) The defendant argued both that the court should not have permitted the prosecution to introduce evidence of conduct more serious than what he had admitted in juvenile court, and that it erred in instructing the jury to consider whether he committed the more serious offense. We disagreed, explaining that not only the fact of conviction, but also the underlying conduct, is probative on penalty. "Accordingly, the trial court in the

36

present case did not err by permitting the prosecution to introduce evidence from which the jury could find the attack constituted an assault by means likely to inflict great bodily injury. Nor did it err by instructing the jury on this point." (*Id.* at p. 312.) Similarly, the court did not err here in instructing the jury it could consider exactly what crime defendant committed, including possibly murder, when he killed Von Seggern.

Finally, defendant argues that "retrial" of the manslaughter conviction violated his fundamental constitutional rights to a fair trial, due process, and to a reliable penalty determination. As we have explained, defendant was not retried for the prior killing. Admitting relevant, admissible evidence does not violate due process, the right to a fair trial, or the right to a reliable penalty determination. Indeed, if anything, presenting all of the evidence and permitting the jury to judge it for itself *increases* the reliability of the penalty determination. "The capital sentencing jury must have the most detailed relevant information about the individual offender." (*People v. Melton*, *supra*, 44 Cal.3d at p. 756, fn. 17 [rejecting similar arguments].) The prosecution presented its evidence, and defendant was permitted to, and did, present his side of the matter. This process was fair to both sides.

### F.  Cumulative Prejudice

Defendant contends the cumulative effect of the asserted errors was prejudicial. However, there was no error to accumulate.

### G.  Other Contentions

Defendant reiterates many challenges to California's death penalty law that we have repeatedly rejected. We see no reason to revisit our previous decisions.

Neither section 190.2 nor section 190.3 is impermissibly broad, and factor (a) of section 190.3 "does not result in the arbitrary and capricious imposition of

37

the death penalty." (*People v. Rountree*, *supra*, 56 Cal.4th at p. 862.)  The jury may properly consider evidence of unadjudicated criminal activity in aggravation. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1180.)  Except for evidence of other crimes and prior convictions, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required.  (*People v. Williams* (2010) 49 Cal.4th 405, 459, 470.)  "The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently."  (*Livingston*, at p. 1180.)  "CALJIC No. 8.88's use of the words 'so substantial,' its use of the word 'warrants' instead of 'appropriate,' its failure to instruct the jury that a sentence of life is mandatory if mitigation outweighs aggravation, and its failure to instruct the jury on a 'presumption of life' does not render the instruction invalid."  (*Rountree*, at pp. 862-863.)  "Use of the death penalty does not violate international law and is not unconstitutional."  (*Livingston*, at p. 1180.)

### III. CONCLUSION

We affirm the judgment.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**BAXTER, J.\***
**GRIMES, J.\*\***

_____
\*   Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

\*\*  Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY WERDEGAR, J.**

I respectfully disagree with the court's opinion insofar as it affirms the conviction for carjacking (Pen. Code, § 215)[1] and the related special-circumstance finding (§ 190.2, subd. (a)(17)(L)).  By holding the phrase "immediate presence" has the same meaning for carjacking (§ 215) as for robbery (§ 211), the court makes every robbery of a car potentially chargeable as a carjacking and subject to that crime's greater punishment, without regard to the difference in culpability.  In my view, section 215's language and history do not support the holding.

Defendant killed Ellen Salling and took her car during a home invasion robbery.  When defendant entered the home, Mrs. Salling was baking cookies in the kitchen and her car was parked in the garage.  Based on these facts the People charged defendant with both robbery and carjacking.  The prosecutor in closing argument told the jury the victim's car, even though in the garage, was in her immediate presence for purposes of robbery because she could, "if not overcome by violence or prevented by fear [have] retain[ed] possession."  This statement followed the established law of robbery.  (See *People v. Hayes* (1990) 52 Cal.3d 577, 626–627.)  But after telling the jury the same facts also proved a carjacking, the prosecutor paused to note he had "detect[ed] a little bit of a quizzical look."  The jurors' reaction was understandable, given the prosecutor had just described

---

[1]     All further citations to statutes are to the Penal Code.

the "classic carjacking" as taking place when "you're driving along the street, and somebody comes at you with a gun." Over defendant's objection, the court instructed the jury that "immediate presence" had the same meaning for both crimes, and the jury convicted defendant of both.

The proposition that a person baking in her kitchen can be carjacked should prompt quizzical looks. The English-speaking world commonly defines "carjacking" as "[t]he stealing or commandeering of an occupied car by threatening the driver with violence; theft from or abduction of a driver by such means." (Oxford English Dict. Online (Dec. 2014) <http://www.oed.com> [as of Feb. 26, 2015].) The word "carjacking," a portmanteau of "car" and "hijacking," reflects the common definition: To "hijack" means "to hold up and commandeer (a vehicle and its load) in transit." (*Ibid.*) Notably, the Attorney General in another case has "admit[ted] that by limiting section 215 to one specific type of property, a motor vehicle, the Legislature focused on criminal conduct *akin to hijacking* that preys on victims in vulnerable circumstances." (*People v. Lopez*, (2003) 31 Cal.4th 1051, 1061 (*Lopez*).) We relied in part on that admission in holding the offense of carjacking requires asportation of the car, and in rejecting the People's argument to the contrary. (*Id.*, at pp. 1062–1063.)

That concerns about carjacking as commonly defined motivated the Legislature to enact section 215 is evident from the following paragraph summarizing the proposed law's purpose, included in virtually every Senate and Assembly committee report on the bill: "There has been considerable increase in the number of persons who have been abducted, many have been subjected to the violent taking of their automobile and some have had a gun used in the taking of the car. This relatively 'new' crime appears to be as much thrill-seeking as theft of a car. If all the thief wanted was the car, it would be simpler to hot-wire the automobile without running the risk of confronting the driver. People have been

2

killed, seriously injured, and placed in great fear, and this calls for a strong message to discourage these crimes.  Additionally law enforcement is reporting this new crime is becoming the initiating rite for aspiring gang members and the incidents are drastically increasing." (Assem. Com. on Pub. Saf., analysis of Sen. Bill No. 60 (1993–1994 Reg. Sess.) for hearing of July 13, 1993, p. 1.)  These reports are significant because they identify the problem the Legislature intended to address.  " '[I]t is reasonable to infer that those who actually voted on the proposed measure read and considered the materials presented in explanation of it, and that the materials therefore provide some indication of how the measure was understood at the time by those who voted to enact it.' " (*People v. Cruz* (1996) 13 Cal.4th 764, 774, fn. 5, quoting *Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7.)  Governor Wilson in signing the legislation also focused on "carjacking" as commonly understood, describing it as "a serious offense which puts all citizens at risk of grievous bodily injury or death even when they feel secure in their own cars." (Governor's message to Sen. on Sen. Bill No. 60 (Sep. 30, 1993) 2 Sen. J. (1993–1994 Reg. Sess.) p. 3502.)

In summary, the "[l]egislative history . . . indicates that the carjacking statute was enacted to address a specific problem — the taking of a motor vehicle directly from its occupants." (*People v. Coleman* (2007) 146 Cal.App.4th 1363, 1369.)  This court has expressly recognized as much:  "The Legislature . . . made carjacking a separate crime [from robbery], and for a good reason.  '[C]arjacking is a particularly serious crime that victimizes persons in vulnerable settings and, because of the nature of the taking, raises a serious potential for harm to the victim, the perpetrator and the public at large.' " (*People v. Hill* (2000) 23 Cal.4th 853, 859 (*Hill*), quoting *People v. Antoine* (1996) 48 Cal.App.4th 489, 495.)  "In the usual case of carjacking . . . , all [occupants] are subjected to a threat of violence, all are exposed to the high level of risk which concerned the Legislature,

3

and all are compelled to surrender their places in the vehicle and suffer a loss of transportation." (*Hill*, at p. 859.)

Confirming its intent to address the specific problem identified in the legislative history — violent confrontations with the occupants of vehicles, often involving gangs — the Legislature set the maximum punishment for carjacking at nine years (§ 215, subd. (b)), as opposed to five years for second degree robbery (§ 213, subd. (a)(1)(B)), and authorized a 15–year enhancement for gang-related carjackings (§ 186.22, subd. (b)(4)(B), added by Stats. 1993, ch. 611, § 3, p. 3479). The Legislature also confirmed its intent to treat carjacking differently and more harshly than robbery by including passengers as victims (§ 215, subd. (a) ["from the person or immediate presence of a passenger"]), even though the companions of a robbery victim are not automatically considered victims of that crime. Implementing legislative intent, we have permitted multiple convictions when a carjacked vehicle had multiple occupants. (*Hill*, *supra*, 23 Cal.4th at pp. 858–861.)

Despite perceiving important differences between carjacking and robbery, the Legislature modeled the carjacking statute on the robbery statute. (See *Lopez*, *supra*, 31 Cal.4th at p. 1059.) To ensure the differences are respected, we have advised the lower courts that the "analogy between robbery and carjacking is imperfect" (*Hill*, *supra*, 23 Cal.4th at p. 860) and that the two statutes should not be interpreted in "lockstep" without regard to legislative intent (*Lopez*, at p. 1061, citing *Hill*, at pp. 855, 860–861). Thus, in *Hill* we construed the statutory phrase "against his or her will" differently for purposes of carjacking (§ 215, subd. (a)) than for robbery (§ 211) after determining the Legislature intended to protect all occupants of vehicles, including infants. (See *Hill*, at pp. 858–861.) Some lower courts, however, have not followed our advice in construing section 215's "immediate presence" requirement. For example, the victim in *People v. Gomez*

4

(2011) 192 Cal.App.4th 609 (*Gomez*), watched from the window of his apartment as robbers who had assaulted him earlier on the grounds of the complex "carjacked" his truck parked outside.  Applying robbery's definition of "immediate presence," the court reasoned the victim was close enough to have retained possession had he not feared another assault.  (*Id.*, at p. 624.)  In *People v. Hoard* (2002) 103 Cal.App.4th 599 (*Hoard*), defendant entered a jewelry store, stole merchandise and an employee's car keys, and "carjacked" the parked car. "Although [the victim] was not physically present in the parking lot when [the defendant] drove the car away," she "could have kept possession" had she not been "forced to relinquish her car keys."  (*Id.*, at p. 609.)

Decisions such as *Gomez*, 192 Cal.App.4th 609, and *Hoard*, *supra*, 103 Cal.App.4th 599, simply define carjacking in lockstep with robbery rather than effectuating the Legislature's purpose to deter criminal conduct "*akin to hijacking*" (*Lopez*, *supra*, 31 Cal.4th at p. 1062) directed toward the occupants of motor vehicles.  Yet here, "as in any case involving statutory interpretation, our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose" (*People v. Murphy* (2001) 25 Cal.4th 136, 142), and not to give words and phrases the same interpretation in every statute regardless of context or legislative history.

In light of the manifest purpose of section 215, "immediate presence" for purposes of carjacking must directly relate to the victim's contemporaneous use of the vehicle.  Only by using a vehicle does a person become exposed to the particular conduct the 1993 Legislature intended section 215 to discourage.[2]  The

---

[2]    To construe "immediate presence" in this way would fairly include activities closely related to the use of a vehicle, such as approaching a car in a

*(footnote continued on next page)*

5

Legislature's decision to treat persons in possession of vehicles and their passengers alike as victims of carjacking further supports this interpretation. A person's status as a passenger, and thus as a victim, necessarily depends on contemporaneous use of the vehicle. Someone who is given a ride home or to work can hardly be thought a passenger after stepping through the building's front door. Section 215's language and history offer no reason to believe the Legislature intended to define a larger zone of "immediate presence" surrounding the possessor of a vehicle than that which surrounds a passenger.

In conclusion, to take a car from a garage by force directed at a person inside a house is robbery but it is not a crime the 1993 Legislature would have recognized as carjacking. Accordingly, I would reverse the conviction for carjacking and the related special-circumstance finding. In all other respects, I would affirm.

**WERDEGAR, J.**

**I CONCUR:**

**LIU, J.**

---

*(footnote continued from previous page)*

parking lot to retrieve it, entering a car, standing beside a car to pump gasoline, and exiting a car after parking.

6

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Johnson
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S093235
**Date Filed:** February 26, 2015

_____

**Court:** Superior
**County:** Lake
**Judge:** Robert L. Crone, Jr.

_____

**Counsel:**

William D. Farber, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Ronald S, Matthias, Assistant Attorney General, Donna M. Provenzano and Masha A. Dabiza, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

William D. Farber
369-B Third Street #164
San Rafael, CA  94901
(415) 472-7279

Masha A. Dabiza
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-1305