RICHMAN, J.,
Dissenting.—In February 2011, Tracy Hayward filed a petition to dissolve her marriage; in April, Jose Osuch filed his response. In early 2012, the parties and their attorneys signed a stipulation that Sacramento Attorney Nancy Perkovich be appointed a private judge to handle the matter, an appointment approved by the Napa Superior Court in April 2012. Perkovich presided over hearings and issued orders, including orders that transferred monies between the parties. Perkovich’s last involvement was in 2013, probably October. Meanwhile, without any involvement by Perkovich, the parties engaged in five months of settlement negotiations, culminating in a January 2014 “Memorandum of Understanding” (MOA) signed by the parties and their attorneys. On May 20, 2014, Jose filed a motion to enforce the MOA. Ten days later a new attorney entered the picture.
On May 30, 2014, Tracy’s current attorney—her fourth—substituted in, and began what can only be described as a vituperative attack on Perkovich, on Jose’s attorney—indeed, on the very concept of private judging. It began *64 with a motion to withdraw the stipulation and remove Perkovich, based on her claimed failure to make a certification. The trial court denied the motion. Tracy sought a writ. We denied it. The Supreme Court denied review.
On October 7, 2014, Tracy filed the petition before us here, asserting for the first time two new grounds for removing Perkovich, two grounds of claimed disqualification never before urged, and based on claimed facts that had been known for over a year, some for almost two. Despite that history, despite that timing, the majority wholeheartedly agrees with Tracy, in an opinion that for some reason views every fact and interprets every circumstance in favor of Tracy—an approach that, as a close reading of the majority opinion will reveal, sometimes results in the majority engaging in a lengthy explanation or justification, and other times in simply dismissing any contrary reading.
Based on that approach, the majority holds that disqualification occurred when Perkovich did not comply with canon 6D(5) of the Code of Judicial Ethics requiring disclosures either “in writing or on the record” when she presided over her first session with the parties, on October 30, 2012. The majority also holds that Perkovich’s response to Tracy’s petition was not a “written, verified answer,” and Perkovich was thus “deemed to have consented to the disqualification,” which in turn resulted in “an admission of the truth of its allegations.”
The majority also holds that all of Perkovich’s orders are void, a holding that necessarily requires disgorgement of all the monies that Perkovich caused to be transferred, doing so without any guidance or direction to the trial court as to how to accomplish that disgorgement.
Finally, the majority goes so far as to hold that as a matter of law the MOA “was tainted” by Perkovich’s orders and is “therefore unenforceable.” (Maj. opn., ante, at p. 55, capitalization & italics omitted.) This holding is notwithstanding that the MOA followed five months of negotiations in which Perkovich had no involvement—and notwithstanding that taint is a question of fact.
I cannot agree with any of that, and I dissent.
As will be discussed, I have a much different view of the salient facts here, facts not mentioned by the majority, that lead me to disagree with the majority’s conclusions as to the law of disqualification. Moreover, the majority disregards that the petition before us here, filed on October 7, 2014—24 months after the first claimed disqualifying circumstance and 12 months after the second—is in abject violation of Code of Civil Procedure, section 170.3, subdivision (c)(1), which requires that Tracy must move “at the *65 earliest practicable opportunity” after the facts of disqualification become known. Put otherwise, even if there were a proper basis for disqualification— which there was not—it was waived. Not to mention time-barred.
The Pertinent Facts as I See Them
Presiding Justice Kline’s majority opinion contains a 23-page statement of ‘“Facts and Proceedings Below,” an extensive recitation to be sure. (Maj. opn., ante, at p. 17.) But there are other facts pertinent to all that transpired here, and I begin with those background facts.
On February 16, 2011, Tracy filed in Napa County a petition to dissolve marriage. She was represented by Napa Attorney Roger Lewis.
On April 1, 2011, Jose filed his response, represented by Napa Attorney Robert Blevans.
Various proceedings were held before Napa County Superior Court judges, in at least one of which Tracy was sanctioned. And at a case management conference on January 9, 2012, the case was set for trial on May 21, 2012. Eleven days later, on January 20, Attorney Lewis substituted out. Tracy was now in propria persona.
Sometime later, apparently in late March, Blevans received a communication from Attorney John Munsill, of Gold River, Sacramento County. Munsill advised that he had been asked to substitute in as attorney for Tracy, and was considering it, but would only do so if Blevans would agree to have the matter dropped from the calendar and presided over by a private judge, Nancy Perkovich, a Sacramento attorney who specialized in family law. Blevans, who knew Perkovich from previous relationships, on behalf of Jose, agreed.
In late March 2012 a comprehensive five-page ‘“Stipulation and Order” (Stipulation) was prepared, drafted by Munsill. The Stipulation was signed on March 28 by Tracy, Jose, Munsill, and Blevans. On March 29, Perkovich signed the oath at the end of the Stipulation. On April 3, Presiding Judge Stone of the Napa County Superior Court signed this order: “Pursuant to Rule 2.830 et seq. of the California Rules of Court, the foregoing selection of Nancy Perkovich, Esq. as Temporary (‘Private’) Judge in the above-titled cause is hereby approved, and said attorney is so designated and assigned. In addition, all other terms set forth in the above Stipulation and Order are hereby so ordered.” On April 5, the Stipulation was filed with the court.
The Stipulation began with a 10-line recital of the broad powers given to Perkovich. Paragraph 4 of the Stipulation recited that “Both parties waive the *66 clerk’s minutes.” The Stipulation went on to include orders vacating the trial date and deferring discovery, apparently done with an eye toward possible resolution.
The first session before Perkovich was not until October 30, 2012, held in her office in Sacramento, a settlement conference. Those in attendance included Tracy and her attorney, Munsill; Jose and his attorney, Blevans; and two accountants, David Schultze on behalf of Tracy, and Darlene Elmore on behalf of Jose. There is no dispute that at the session Perkovich made oral disclosures about her prior relationships with Munsill and Blevans. As the majority describes it, Perkovich has represented that she told all present “ ‘about my professional contacts with each attorney including the fact that (1)1 had been hired once before as a judge pro tern in a case where Blevans was an attorney, (2) Blevans was hired as a judge pro tern once in a case where I was an attorney, (3) Munsill was hired as a judge pro tern once in a case where I was an attorney, (4) I was hired as a settlement judge once in a case where Munsill was an attorney, (5) Munsill and I had been previously associated as counsel on a case, (6) I served on the Sacramento Family Law Bar Association Committee with John Munsill and socialized once with he and his wife and children related to that professional organization, and (7) I am a member of the American Academy of Matrimonial Lawyers and was acquainted with Blevans from that organization. I also disclosed that I had hired David Schultze, CPA many times on cases throughout my career and had also had him as an opposing expert on many cases. I had not previously met Darlene Elmore, CPA. I asked all parties and attorneys if they were comfortable with my acting as judge pro tern. All parties indicated that they wished me to proceed in that capacity.’ ” (Maj. opn., ante, at p. 32.) Indeed they did.
As the majority also acknowledges, ‘“Blevans, Elmore, and Schultze all stated in declarations or deposition testimony . . . that Perkovich . . . disclosed her prior contacts with Blevans and with Munsill at the October 2012 meeting, including that she and each of the attorneys had acted as temporary judge in each other’s cases, and that the parties agreed to proceed with Perkovich as temporary judge. . . . [¶] Munsill testified at a deposition in February 2015 that he recalled Perkovich discussing at the settlement conference ‘her various prior connections with both [Blevans] and me,’ but did not recall ‘the details’ of that discussion. He did not recall Tracy expressing concerns about Perkovich’s disclosures. Munsill acknowledged that he had a ‘mutual judging relationship with Perkovich, each having served as judge in a case where the other represented a party. Munsill stated that he had no reason to believe inaccurate the statement in Blevan’s declaration that after Perkovich’s disclosures at the settlement conference, ‘both counsel and the parties acknowledged their understanding and agreement to move forward with Judge Pro Tern Perkovich presiding.’ He did not recall presenting Tracy with a *67 written waiver of any potential conflict after Perkovich disclosed her professional relationships with the two attorneys and stated, ‘I don’t recall there being a need for that.’ ” (Maj. opn., ante, at pp. 32-33.)
The register of actions reflects one uneventful entry after October 30, 2012, on December 12. The next two entries, on March 26 and April 19, 2013, are substitutions of attorneys. Under the first, Munsill was out, and Tracy was again in propria persona. Under the second, Trevor Jackson, an attorney in Napa, substituted in.
Over the ensuing months various hearings were held before Perkovich. A “Summary of Hearings, Conferences and Orders” prepared by Perkovich— which is not disputed by either Tracy or Jose—shows that there were seven telephonic case management conferences (on Nov. 2 and 20, 2012, Feb. 11, Mar. 4, Apr. 26, June 3 and 13, 2013) before a case management order was filed on September 10, 2013, and another telephonic conference on November 18, 2013, before a second case management order was filed on December 16, 2013. There were two actual hearings (on July 30, 2013, and a “long cause hearing” on Oct. 9, 2013) and a telephonic hearing “re Claim of Exemption” on October 24, 2013. And, of course, Perkovich made the various orders Tracy seeks to void here.
Meanwhile, settlement negotiations resumed, without any Perkovich involvement, which negotiations continued over many months. They began with a conference in June 2013, a few months after Jackson substituted into the case. In July Tracy extended two proposals, and Jose responded in an August 9 letter, where he proposed a “complete and global resolution,” the terms of which included that Tracy pay Jose $300,000 to equalize the award to Tracy of the parties’ residence; $2.5 million to equalize the community interest in the companies; and spousal support of $25,000 per month until Jose’s death, remarriage or further court order. As the majority puts it, “Blevans . . . described [this proposal] as having become the ‘foundation’ for the memorandum of agreement (MOA) the parties eventually signed.” (Maj. opn., ante, at p. 24.)
While those settlement negotiations continued, on November 7, 2013 Jose filed a “Request for Control and Management of PPNV or in the Alternative for Appointment of A Receiver,” set for hearing on January 14, 2014. The basis of Jose’s motion was that Tracy had engaged in various shenanigans vis-a-vis the business, to Jose’s detriment. As Jose’s counsel represented to the court below, the complained-of conduct includes Tracy’s “actions in terminating her salary so that [Jose] would not be paid. It includes the court’s finding that she took $600,000 in excess distribution from the company at a time when she was saying the company was in precarious financial condition, *68 paid out $270,000 for her own personal litigation expenses, shipped off $30,000 to Grand Cayman, turned over control of the company to Howell Bennett and Stan Blyth who then attempted a corporate takeover.”
Meanwhile, settlement negotiations continued. On November 25, Tracy proposed a settlement providing for payments of $300,000 for the residence, $2 million for the companies, and $10,000 monthly spousal support for Jose’s life, regardless of remarriage. On December 4, Blevans, Tracy, Jackson, and Tracy’s business attorneys, Ian Carter and Eric Jeppson, attended an all-day settlement conference, which was adjourned in order to provide Jose time to prepare a disclosure statement regarding foreign bank accounts. After the disclosure was made, discussions resumed at a December 23 meeting attended by Blevans, Jackson, Carter and Jeppson. Through these three attorneys, Blevans says, Tracy proposed a $2.5 million equalizing payment and spousal support of $18,000 per month, to be reduced to $16,500 per month after six years and terminated after 11 years. Jose’s counterproposal specified payment of $300,000 for the residence, $2.5 million for the companies, and spousal support of $25,000 per month, nonmodifiable until Tracy paid the $2.5 million in full.
On January 10, 2014, Blevans met with Jeppson and Carter to discuss how Tracy would structure the payments Jose had agreed to accept at the December 23 meeting, and Blevans agreed to the equalizing payment being reduced to $2.4 million. And on that day the MOA was signed.
On May 20, 2014, Jose filed a motion to enforce the MOA. Ten days later, another substitution of attorneys was filed. Jackson was out, and Tracy was now represented by her fourth attorney, Keith Dolnick of Irvine (apparently later to be associated with David Ezra, also of Irvine).
With that, the litigation took off, the upshot of which is the last 25 pages in the register of actions. But the litigation did not just increase in quantity, but in intensity, with Tracy’s papers reflecting a tone that can only be called intemperate. Below, and here, Tracy filed papers riddled with vituperation, filled with attacks on the very system of private judging, not to mention ad hominem attacks on Perkovich and Blevans, attorneys I understand to be reputable members of the American Academy of Matrimonial Lawyers. Jose’s briefs implore us to disregard what he claims are the unsupported attacks manifest in Tracy’s briefs. For sure.[1]
*69 Regardless, with briefs riddled with such invective, Tracy’s lawyers set out to undo all that had transpired: to have Perkovich disqualified, to have her orders declared void—indeed, to have the MOA held invalid because it was signed against the background of Perkovich’s rulings, which, in the words of Tracy’s attorneys, “created the ultimate duress.”[2]
The majority agrees on all counts. I agree on none. The law does not support disqualification. But even if it did, Tracy’s motion was untimely. And I do not understand how the majority can decide duress, ultimate or otherwise, as a matter of law. Duress is an issue of fact. (Kravitz v. BT Visual Images (2001) 89 Cal.App.4th 164, 176 [107 Cal.Rptr.2d 209].)
*70 DISCUSSION
Private Judges
Article VI, section 21 of the California Constitution provides that “On stipulation of the parties litigant the court may order a cause to be tried by a temporary judge who is a member of the State Bar, sworn and empowered to act until final determination of the cause.” As described in In re Marriage of Assemi (1994) 7 Cal.4th 896, 907-908 [30 Cal.Rptr.2d 265, 872 P.2d 1190]: “ ‘California has created a full-fledged system of private judges, colloquially “rent-a-judge,” which permits the parties to agree to a temporary judge .... Such an agreement allows the parties to bypass urban courts’ crowded calendars, obtain a trial on a certain, prearranged date convenient to parties and witnesses, and avoid the cost of trailing on a master calendar while waiting for a courtroom.’ ”
Recognizing the propriety of private judging, the majority, however obliquely, casts a skeptical eye on it, especially in the family law setting, suggesting it needs some special oversight there, apparently because the participants are familiar with one another.
I see it differently, and perhaps especially in the family law area, for reasons described, for example, by retired Los Angeles Superior Court Family Law Commissioner Jill S. Robbins: “Unlike public judges, private judges are selected by the parties. One tremendous advantage of private judging is that it allows counsel to ensure that the judicial officer has experience in the relevant substantive area of law involved. Family law, for example, has become so sophisticated that the attorney must have a working knowledge of juvenile dependency, bankruptcy, general corporate formation, business transactions and valuation techniques, cash flow analysis, security and enforcement methodology for future payments, and behavioral sciences, to name a few. This knowledge, of course, is in addition to the substantive area of family law and all its intricacies. Some family law judges never practiced family law before their appointment. Accordingly, the selection of a private judge with expertise in the applicable area or areas provides a significant advantage, not only in reducing ‘education time’ but in providing the attorney and client with the certainty that the private judge will understand the evidence presented.” (Robbins, The Private Judge: California Anomaly or Wave of the Future (2000) 3 IAFL L.J. at p. 3.)
As the law review article cited by the majority sums up: “private judges will likely have had years of experience . . . adjudicating family disputes. Parties can select a mutually agreeable private judge who has specialized knowledge of the relevant area of family law, such as . . . property division, *71 or alimony. . . . [¶] . . . Given that divorce . . . battles can drag on ... to the detriment of all . . . involved, speed and efficiency are invaluable.” (Comment, The Marriage of Family Law and Private Judging in California (2007) 116 Yale L.J. 1615, 1618-1619, fns. omitted; see Judicial Council of Cal., Report and Recommendations of the Judicial Council Advisory Committee on Private Judges (1990) pp. 14-15.) In sum, not only do private judges provide expediency, but perhaps most important of all they provide the parties and their counsel an expert to preside over the dispute, someone counsel knows, and for whom he or she has respect. And trusts.
Whether these reputed virtues of a private judge are real is not at issue. What is relevant is that Tracy and Jose elected the procedure.
There Is No Basis for Disqualification

Introduction to the Issue

The majority begins its substantive discussion as follows: ‘“Tracy’s motion to disqualify was based on Perkovich’s alleged violation of Canon 6D by failing to disclose her personal or professional relationships with Blevans ‘in writing or on the record’ and failure to obtain the parties’ written waiver to disqualification on that ground and file it with the record as required by section 170.3, subdivision (b)(1). The motion to disqualify was also based upon the claim that Perkovich’s conduct during the proceedings over which she presided demonstrated that she was actually biased and prejudiced against Tracy. Tracy maintains that a person aware of the facts Perkovich declined to disclose in writing or on the record, and/or her biased conduct during the proceedings, ‘might reasonably entertain a doubt that [Perkovich] would be able to be impartial.’ (Canon 6D(3)(a)(vii)(C); § 170.1, subd. (a)(6)(A)(iii).)” (Maj. opn., ante, at p. 36.)
Tracy’s petition in support of disqualification devoted the bulk of its argument, more than two-thirds, to the first claim of disqualification, the claimed noncompliance with canon 6D of the California Code of Judicial Ethics. Similarly, the oral arguments here focused almost exclusively on the canon. Despite that, the majority essentially disregards that claim, to the point that it is virtually ignored.
So despite Tracy’s focus and emphasis, and despite her argument, I will address the issues in the same order as the majority.

Code of Civil Procedure Section 170.3 Does Not Support Disqualification.

The majority focuses on Tracy’s second basis for disqualification and holds that because Perkovich did not “ ‘file a written verified answer admitting or *72 denying’ ” the allegations in Tracy’s statement, she was “ ‘deemed to have consented to . . . her disqualification.’ ” (Maj. opn., ante, at p. 36.) And, the majority concludes, “That determination treats the judge’s failure to file a response to the statement of disqualification as an admission of the truth of its allegations . . . .” (Id. at p. 37.)
This holding, I submit, is not supported here. Worse, it is flatly contrary to Presiding Judge Stone’s order below.
Before turning to a demonstration of why, I begin with the observation that the majority’s conclusion shows no appreciation of the realities of the situation, no consideration for what I understand, anecdotally at least, to be the real-life facts facing trial judges. Specifically: I understand that the standing order in many superior courts is that a judge who receives a challenge is to immediately advise his or her presiding judge. And I understand that the challenged judge is put in contact with the Judicial Council, which provides assistance, usually in the form of a lawyer to advise and assist the judge in how to respond. Put simply, a challenge to a judge is a most significant, yet infrequent, occurrence, one requiring expert help and guidance, help the court system provides. Thus, for example, there are at least two publications by the Judicial Council addressing the subject: (1) California Judges Bench Guide: Disqualification of Judge; and (2) Disqualification and Disclosure.[3] There is also a video to assist judges in dealing with judicial challenges: <http://www2.courtinfo.ca.gov/cjer/judicial/1715.htm> (as of Aug. 3, 2016). And a Serranus Web site.
Perkovich, of course, had access to none of that assistance. So, acting on her own, in response to Tracy’s request for disqualification Perkovich prepared a letter to Presiding Judge Stone that was hand delivered to the court and filed on November 7, 2014. That letter provided in its entirety as follows:
*73 “Dear Judge Stone,
“I would like to recuse myself from the case of Marriage of Hayward & Osuch. The Petitioner, Tracy Hayward, filed a motion for disqualification on the grounds of bias on October 7, 2014. She alleges that I have a financial interest in the proceedings because I am paid for my work pursuant to the stipulation of the parties appointing me as the Judge Pro Tempore. She further claims a bias in favor of Blevans because Blevans has acted as a private settlement judge on one case where I was associated as counsel and because I have been hired on two cases where he was an attorney. I also had the same mutual judging relationship with two of Ms. Hayward’s previous attorneys, Roger Lewis and John Munsill. I disagree that these professional relationships constitute bias. The California Rules of Court, Rule 2.830, et. seq. specifically allows for retention of private judges. The Petitioner consented to my retention. She did so after disclosure from me at our first case management meeting about the details of my professional relationship with both Munsill and Blevans.
“I have, however, become concerned about my personal safety in this case due to Ms. Hayward’s conduct. Her behavior has become increasingly hostile with angry outbursts to the point that I am fearful of her. It is also evident from Ms. Hayward’s ongoing violations of the existing court orders that she will never accept anything I decide. I therefore feel that I am an impediment to resolution of the parties’ case, which is not desirable. It is for these reasons that I request a recusal.”
The effect of this, the majority concludes, is the “admission of the truth of its allegations.” (Maj. opn., ante, at p. 37.)
The Supreme Court has held that although the disqualification statute refers to a written, verified answer, a written declaration under penalty of perjury will satisfy the “statutory requirement.” (People v. Mayfield (1997) 14 Cal.4th 668, 811 [60 Cal.Rptr.2d 1, 928 P.2d 485].) While admittedly not a verified answer or a declaration, Perkovich filed a response. In the cases the majority cites, the challenged judge filed nothing. (Urias v. Harris Farms, Inc. (1991) 234 Cal.App.3d 415, 419 [285 Cal.Rptr. 659] [judge “did not respond”]; Calhoun v. Superior Court (1958) 51 Cal.2d 257, 260 [331 P.2d 648] [“no denial of the allegations thereof by Judge Hewlicker”].)[4]
*74 But most troubling of all is the majority’s conclusion as to the claimed effect of this—that it “admi[ts] the truth of [the] allegations” (maj. opn., ante, at p. 37.)—is that it disregards Presiding Judge Stone’s order of November 7, 2014. There, he disqualified Perkovich, finding that her letter requesting recusal ‘“does not satisfy the requirement of the filing of consent to the disqualification,” and that ‘“as a result of her failure to file a consent or a verified answer within the time allowed, Nancy Perkovich is deemed to have consented to her disqualification pursuant to Code of Civil Procedure section 170.3(c)(4).” But most significantly, Judge Stone’s order held that ‘“The court is making no finding as to whether the allegations set forth in Petitioner Tracy Hayward’s Request for Order re Motion for Disqualification, filed October 7, 2014, is true.”

Canon 6(D) Does Not Support Disqualification

As noted, the claimed noncompliance with canon 6D of the California Code of Judicial Ethics was the focus of most of Tracy’s position here. That position is treated by the majority almost as an afterthought, relegated to a brief discussion. Whatever the significance to the majority, the claim does not support disqualification.
I do not understand that a failure to comply with a canon results in per se disqualification. The majority cites no law that it does. The law relied on by Jose holds it does not. (See, e.g., Wechsler v. Superior Court (2014) 224 Cal.App.4th 384, 387 [168 Cal.Rptr.3d 605] [judge not disqualified for failing to disclose potentially disqualifying information absent additional facts, even though disclosure required under Cal. Code Jud. Ethics, canon 3E(2)(a)]; People v. Martinez (1978) 82 Cal.App.3d 1, 16 [147 Cal.Rptr. 208] [judge not disqualified even though his ‘“intemperate and inflammatory remarks were totally improper; his conduct clearly violated canon 2A”].) So, the fact that Perkovich failed to make disclosures as required does not, without more, result in disqualification.
But beyond that, the majority assumes that there was noncompliance with the canon, without any meaningful discussion of paragraph 4 in the Stipulation, that “Both parties waive the clerk’s minutes.” That provision, I submit, could—and should—be read to say the parties expressly waived the canon’s requirement.
Under the canon, the disclosure must be “in writing or on the record.” (Cal. Code Jud. Ethics, canon 6D(5), italics added.) No question there was no “writing.” But there is a real question whether “on the record” alternative was waived. As the majority recognizes, “The Committee on Judicial Ethics Opinions, which operates under the aegis of the California Supreme Court, *75 has pointed out that one of the ways in which a disqualifying disclosure can be placed ‘on the record’ pursuant to canon 3E(2)(a) when there is no court reporter or electronic recording of the proceedings is to ‘[e]nter the disclosure document in the case file as a minute order, official court minutes, or a formal order.’ (Cal. Supreme Court, Com. on Judicial Ethics, Disclosure on the Record When There Is No Court Reporter or Electronic Recording of the Proceedings, formal opinion No. 2013-002 (Dec. 11, 2013) p. 9.)” (Maj. opn., ante, at p. 48, fn. 32.)
As I understand it, Perkovich conducted the settlement conference in her office, with no court reporter, and no clerk, no one in the usual position who would create a “minute order, official court minutes, or a formal order.” Perhaps Munsill and Blevans, both experienced and involved with private judging, provided for that in the Stipulation, agreeing that “Both parties waive the clerk’s minutes.” What this means is nowhere discussed in the record, there being no testimony about it. The majority says, however unsupportedly, “[t]he obvious meaning of this brief sentence is simply that the parties intended to forgo formal clerk’s minutes for the proceedings to be held before the temporary judge.” (Maj. opn., ante, at p. 48.) That may be the “obvious meaning” to the majority. The “obvious meaning” to me is that this is an agreement, by knowledgeable counsel, using words of art, to effect an express waiver.
The majority notes that Jose argues that “Tracy waived [the on the record requirement].” (Maj. opn., ante, at p. 48.) The majority rejects the argument based on Code of Civil Procedure section 170.3, subdivision (b)(1), which the majority says “requires a waiver of disqualification to ‘recite the basis for the disqualification’ and to be ‘signed by all parties and their attorneys and filed in the record.’ (§ 170.3, subd. (b)(1).) No such waiver exists in the present case.” (Maj. opn., ante, at p. 48.) This, I submit, is simply wrong, as section 170.3, subdivision (b)(1) applies only “when the judge determines himself or herself to be disqualified.” Perkovich did not do that here.
But even if the record does not support an express waiver, it certainly supports an implied one.
Any Claimed Disqualification Was Waived
There is no doubt that parties can waive disqualification by their conduct. (People v. Johnson (2015) 60 Cal.4th 966, 979-980 [184 Cal.Rptr.3d 612, 343 P.3d 808] (Johnson); Tri Counties Bank v. Superior Court (2008) 167 Cal.App.4th 1332, 1337-1338 [84 Cal.Rptr.3d 835] (Tri Counties); In re Steven O. (1991) 229 Cal.App.3d 46, 53-54 [279 Cal.Rptr. 868].) Thus in Johnson, a capital murder case, the Supreme Court held that the defendant *76 waived his right to disqualify the judge based on the judge’s close professional and personal relationship with the prosecutor when, at the outset of the proceeding, and after full disclosure of the relationship, counsel agreed to proceed. (Johnson, supra, 60 Cal.4th at pp. 978-980.)
The majority observes that Tracy claims she did not hear Perkovich’s disclosure. But even if she did not, it would not matter. Again Johnson is apt, where a unanimous Supreme Court noted that even if the defendant was not properly told by his counsel about the judge’s relationship, the right to challenge the judge is within “ ‘ “ ‘counsel’s complete control of . . . strategies and tactics.’ ” ’ ” (Johnson, supra, 60 Cal.4th at p. 979, italics omitted.)
People v. Scott (1997) 15 Cal.4th 1188 [65 Cal.Rptr.2d 240, 939 P.2d 354] is similar. There, the defendant argued he was not personally present when the circumstances giving rise to the waiver occurred. The Supreme Court held that the defendant’s “absence makes no difference. He was represented by counsel, who was present at the hearing. ‘ “When the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of ‘fundamental’ personal rights to counsel’s complete control of defense strategies and tactics.” ’ (In re Horton (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335], original italics [holding that counsel may impliedly stipulate to trial before a court commissioner].) ‘ “An attorney may not sit back, fully participate in a trial and then claim that the court was without jurisdiction on receiving a result unfavorable to him.” ’ (Id. at p. 91.)” (People v. Scott, supra, 15 Cal.4th at p. 1207.)
Here, Tracy did not promptly seek Perkovich’s disqualification even though she and her attorney, Munsill, knew on October 30, 2012, that the disclosures were not made on the record. They decided not to challenge Perkovich at the time, and in fact consented to her continuing as the private judge. This decision “came within the range of tactical decisions competent counsel may make”; it is not to be second guessed. (Johnson, supra, 60 Cal.4th at p. 980.)
That waiver is present here is also demonstrated by Tracy’s earlier attempts to have Perkovich removed.
As indicated in the majority, Tracy first attempted to have Perkovich removed on September 3, 2013, via a motion filed by Attorney Jackson. Nothing was said about noncompliance with canon 6(D) of the California Code of Judicial Ethics, nothing about any claimed biased conduct or rulings. The motion was denied three weeks later.
*77 Then, on May 30, 2014, represented by Attorney Dolnick, Tracy filed what the majority calls a “second motion to withdraw the stipulation,” in the words of the majority, “this time on the ground that, due to Ms. Perkovich’s failure to certify that she was ‘aware of and will comply with applicable provisions of canon 6 of the Code of Judicial Ethics and the Rules of Court,’ as required by rule 2.831(b), she lacked the power to rule on the pending motion to enforce the MOA pursuant to section 664.6, and lacked judicial authority ‘to make any of the determinations she has made in this matter to date.’ The motion maintained that Ms. Perkovich’s failure to provide the certification required by the Rules of Court provided ‘good cause’ permitting Tracy to withdraw the stipulation (Rule 2.831(1)).” (Maj. opn., ante, at pp. 25-26.) Again, nothing was said about claimed noncompliance with the canon. And nothing about any claimed biased conduct or rulings by Perkovich, all of which had happened many months before.
Tracy’s second motion to remove Perkovich was denied on July 11, 2014. She took a writ. We denied it. The Supreme Court denied review.
Only in Tracy’s third attempt to remove Perkovich, filed on October 7, 2014, did Tracy make the claims as to noncompliance with the canon and the claimed biased conduct the majority relies on here. This time, as the majority states, “Tracy’s ‘statement of disqualification’[5] was based on two separate grounds” (maj. opn., ante, at p. 26), those quoted above. And as to the second ground, the majority describes it this way: “The second . . . was that any person aware of her conduct ‘would have substantial doubt that Perkovich was or could be impartial,’ and Perkovich should therefore be disqualified under section 170.1, subdivision (a)(6)(A)(iii). In support of her bias claim, Tracy declared that Ms. Perkovich ‘seemed to visibly favor’ Jose and Blevans and ‘took steps to block’ Tracy’s attorney from introducing evidence supporting her contentions. . . . Tracy declared that Perkovich conveyed bias by her ‘body language and her tone toward me and Mr. Jackson,’ which ‘was very different than it was toward Mr. Blevans and [Jose]. She was very standoffish, and regularly appeared to be visibly and noticeably annoyed with me’ and ‘often would stand over me with her arms crossed. She would never make eye contact with me. When [Jose] or Blevans spoke, Perkovich was relaxed and thoughtful, often making helpful comments or asking insightful questions that would help them fully develop the point they were trying to make.’ Perkovich also allegedly engaged in ‘highly inappropriate’ interactions with Blevans. ‘For example,’ Tracy stated, ‘during the July 30, 2013, hearing, I personally saw Perkovich flirt with Blevans, proclaiming, “Oh Bob, that’s so *78 funny of you,” while she batted her eyelashes at him,’ and Perkovich and Blevans ‘inappropriately spoke to each other about the case when my attorney was not present,’ which Tracy assertedly learned from an invoice billing her for the time Perkovich spent on the phone, without Tracy’s lawyer, in preparation for a hearing.” (Maj. opn., ante, at p. 27.)
As seen, to the extent Tracy identified any date when any allegedly biased activity occurred, the latest date mentioned is ‘“July 30, 2013,” the day Tracy claims she saw Perkovich “flirt” with Blevans. Her attempt at disqualification filed 14 months later was untimely.
Any Claim for Disqualification Was Untimely
In the express language of the disqualification statute, a party seeking disqualification must move “at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification.” (§ 170.3, subd. (c); see People v. Guerra (2006) 37 Cal.4th 1067, 1111 [40 Cal.Rptr.3d 118, 129 P.3d 321]; People v. Scott, supra, 15 Cal.4th at p. 1206.) Failure to comply with the promptness requirement constitutes forfeiture or an implied waiver of the disqualification. (Tri-Counties Bank v. Superior Court (2008) 167 Cal.App.4th 1332, 1337 [84 Cal.Rptr.3d 835]; In re Steven O., supra, 229 Cal.App.3d at pp. 54-55.) The Supreme Court has many times set out the reason for the promptness rule: “‘ “[I]t would seem . . . intolerable to permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.” ’ ” (People v. Scott, supra, 15 Cal.4th at p. 1207, quoting In re Steven O., supra, 229 Cal.App.3d at pp. 53-55.) Those principles govern here.
Perkovich’s claimed noncompliance with canon 6D of the California Code of Judicial Ethics was in late October 2012. It was necessarily known at that time. The claimed biased rulings and biased conduct were all known by mid-2013, October at the latest. Tracy’s request to disqualify was untimely.
The MOA Cannot Be Set Aside as a Matter of Law
The majority’s penultimate holding is that “the MOA was tainted by Perkovich’s void rulings and is therefore unenforceable” (maj. opn., ante, at p. 55, capitalization & italics omitted.), a holding apparently made in response to Tracy’s assertion that the MOA was the result of the “ultimate duress.” As the majority describes it, “Tracy emphasizes that the MOA was proposed in the wake of a series of adverse rulings issued by Perkovich after Munsill was replaced as her counsel by Jackson, who was unaware of the mutual judging *79 relationships between Perkovich and Blevans. According to Tracy, Blevans was aware of the hostility between Perkovich and Tracy and her counsel and, in that context, the MOA presented Jackson and Tracy a Hobson’s choice (Ibid.) And so the majority finds such “taint,” expressly doing so “as a matter of law.”
I disagree, for reasons both legal and factual.
As to the legal, as noted, duress is a question of fact. (Kravitz v. BT Visual Images, supra, 89 Cal.App.4th 164, 176.) The majority cites nothing to the contrary.
As to the factual, the circumstances leading to the MOA are described in detail above. To briefly recap, the MOA was signed in January 2014, following months of settlement discussions that resumed in August 2013. The terms of the MOA were very much along the lines of a proposal Tracy had made, though one of the monetary terms was increased. And the MOA followed an all day settlement conference on December 14 attended by Tracy and three attorneys on her side: Jackson, representing her, and Ian Carter and Eric Jeppson, representing her company. I do not understand how that can be duress as a matter of law.
That it is not is made clear by Rossco Holdings, Inc. v. Bank of America (2007) 149 Cal.App.4th 1353 [58 Cal.Rptr.3d 141], the one case cited by the majority, a case the majority describes as follows: “As earlier described, the trial judge [Judge Williams] in the case disqualified himself after issuing an order compelling arbitration. The newly assigned judge vacated not only the order compelling arbitration, but also the subsequent arbitration award. While affirming that the disqualified judge’s order compelling arbitration was void, the reviewing court reversed the order vacating the arbitration award as premature because the award was not necessarily improper: . . . [T]he arbitration award should be vacated only if the trial court determined that the arbitration was tainted by the disqualified judge, or should be vacated on other grounds. [Citation.]” (Maj. opn., ante, at pp. 57-58.)
In other words, the Court of Appeal remanded for further proceedings, with the trial court to vacate the arbitration award “[o]nly if the trial court concludes that the arbitration was tainted by Judge Williams.” (Rossco Holdings, Inc. v. Bank of America, supra, 149 Cal.App.4th at p. 1367.) Or, to put it bluntly, “taint” is a question of fact.
Some Closing Observations
I conclude with the observation that I have no dispute with the majority’s laudatory characterizations of the goals of canon 6D of the California Code of *80 Judicial Ethics and the importance of having judicial decision makers free from the suspicion of possible bias. And certainly I do not disagree with the majority that disclosure requirements must be taken seriously.
That said, I do disagree that a private judge’s failure to make such a disclosure irretrievably taints everything done by him or her. No case I am aware of so holds, and I am not prepared to sign on to the first case that does, especially not in light of the facts here.
Moreover, I would not be surprised to learn that there may be cases where parties through their attorneys have chosen to proceed with a private judge— the respected person they want, and trust, to decide their case—in which the private judge may not have strictly complied with canon 6D of the California Code of Judicial Ethics, not making the required disclosure “in writing or on the record.” If that is true, parties up and down California will wake up to a majority opinion that tells them that the orders under which they are proceeding with their financial affairs—not to mention, the custody of their children—are void. If, heaven forbid, that is the case, I can only imagine the havoc that will follow.
The majority goes where no court has gone before. I refuse to join them. And I dissent.
The petition of real party in interest for review by the Supreme Court was granted November 9, 2016, S237174. On March 1, 2017, review dismissed and cause transferred to Court of Appeal, First Appellate District, Division Two.

 Here are a few quotations from the briefs:
“No California litigant should ever have to wonder whether the paid private judge they entrusted with their' case is corrupt and aligned with the other side’s attorney.”
“The relationship between Mr. Blevans and Ms. Perkovich has cast a pall over this case. The thought that a system could be manipulated to the point that a ‘settlement’ could be *69 obtained by threatening to have a private judge who was subject to disqualification take away a litigant’s company and her livelihood unless millions of dollars were forfeited via ‘settlement’ is stomach toning.”
“Instead, these attorneys and experts had worked together and side-stepped ethical requirements so often, that they never even considered complying with the Canons of Judicial Ethics by making on the record disclosures. Nor did they ever consider requesting a proper signed, written waiver they could file with the court. [¶] If a litigant caught on and protested, these family law attorneys planned to chele the wagons and try to blame the litigant.”
“Apparently, attorneys and experts who all know each other and work together on case after case, get in a room or call each other’s cell phones, and they collectively decide what is going to happen and how the litigants’ money will be doled out to the involved professionals. [¶] Attorneys who are socially and professionally connected to the experts and other attorneys in the case, acting as paid judges for their friends, is bad enough. But where the ‘judging’ relationship is mutual, there is a strong temptation for attorneys who act as ‘paid private judges’ to engage in unethical and inappropriate ‘you scratch by back; I’ll scratch yours’ behavior.”
“However, by systematically ‘relaxing’ these ethical rules, small groups of family law attorneys can dominate their local markets, knowing reciprocity will ensure ample attorney’s fee awards and outcomes that financially benefit the attorneys who hire their friends as judges. [¶] This routinized departure from the ethical rules helps ensure that money will be free-flowing for the attorneys and experts—handed out by a ‘judge’ who, in reality, is a friend they can count on.”

 Hyperbole by attorneys is one thing. Disingenuousness is another. And I am particularly concerned by the 180-degree change of position manifest by the belated claim of duress here, in light of the express concession of Tracy and her attorneys in their writ petition to this court. There, in arguing that Perkovich should not be the one to enforce the MOA, they made these representations: “The MOA is not the result of a ruling or order of attorney Perkovich, and she did not sign it. She had no role in its preparation or execution. The MOA was negotiated by lawyers working in the office of Jose’s counsel. It was signed initially by Tracy at her private residence and later by her at her family law attorney’s office. [¶] . . . [¶] [Perkovich’s] role as a judicial officer was not in play in the MOA. Her imprimatur was not necessary for it to have effect. [¶] . . . [¶] Nancy Perkovich has no nexus with the MOA Tracy and Jose executed.”
I do not understand such a blatant change of position to be ethical advocacy. And the majority’s labored effort to explain this away in a two-page discussion of “ancillary” matters does not convince me otherwise.

 The introduction to Disqualification and Disclosure, described as a “Compilation of Advice From the Ethics Committee of the California Judges Association and Discipline by the Commission on Judicial Performance,” nicely synthesizes the situation:
“INTRODUCTION "’This paper addresses the problems facing judges in recognizing situations and cases in their court assignments that mandate disclosure and potential disqualification. Judges are required by statute (CCP § 170) and the canons (Code of Judicial Ethics Canon 3B( 1)) to hear and decide all matters in which they are not disqualified, and they may be disciplined for improper recusal [citation]. At the same time, they are required to adhere diligently to the statutes governing disqualification (CCP §§ 170.1 et seq.) .... However, in determining the propriety of presiding in matters which contain factors that overlap on the remainder of their personal and professional lives, judges are frequently confronted with questions that cannot be resolved by simple reference to the codes and the canons.
“The California Judges Association provides a hot line service with immediate member access to a judge serving on the Committee on Judicial Ethics. The presented problem is analyzed, and informal advice is rendered ....
“This paper focuses on disqualification and disclosure problems . . . .”

 As shown below (see fn. 5), the majority notes, but excuses, that Tracy’s attempt to remove Perkovich was not the correct document, not the required “statement of disqualification.” No matter, the majority says, we’ll consider it as proper. But not as to Perkovich’s letter denying the charges and asking to be released. No, that was not the required “answer,” and so the majority concludes Perkovich admitted all charges of bias. In other words, no need to hold Tracy to the letter of the law. Just Perkovich.

 Actually, Tracy’s request was not a “statement of disqualification,” and thus not the proper pleading. It was filed on a Judicial Council form “Request for Order,” and characterized as a “Motion to Disqualify Nancy Perkovich.” The proper form is a “Statement of Disqualification.” (See Urias v. Harris Farms, Inc., supra, 234 Cal.App.3d at p. 421.)