Filed 9/14/23  P. v. Tunby CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>KEVIN JOHNATHAN TUNBY,<br><br>     Defendant and Appellant. | G061485<br><br>(Super. Ct. No. 21NF1099)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Reversed in part and remanded for resentencing.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Arlene Sevidal and Eric Tran, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Kevin Johnathan Tunby appeals from a judgment entered after a jury convicted him on two counts of carjacking under Penal Code section 215, subdivision (a).[1]  Tunby challenges only count 1.  He argues that insufficient evidence supports the carjacking conviction and that his conduct does not qualify as a carjacking.  We agree.  Accordingly, we reverse his carjacking conviction on count 1 and remand for resentencing.  In all other respects, the judgment is affirmed.

FACTS AND PROCEDURAL HISTORY

The relevant facts are undisputed.  Ali Alboslemy owned and drove a tow truck for work.  On March 25, 2021, between 1:00 p.m. and 2:00 p.m., Alboslemy parked his truck on West Ball Road in Anaheim, California, near his residence.  After parking his truck, he left his key in the ignition, because he was unable to remove it, and used a second key to lock his truck.  His keys did not have remote locking.

The next day, between 2:30 p.m. and 3:00 p.m., Alboslemy began to receive several telephone calls.  People were notifying him that his truck, which had Alboslemy's telephone number displayed on the door, was hitting cars and that the driver was driving on the sidewalk.  These calls prompted Alboslemy to check on his truck and, as he could not find it, he reported it missing to the police.  When a caller informed Alboslemy that the truck was nearby, Alboslemy drove around the area in his car to find the truck.

After driving for approximately 20 minutes, Alboslemy spotted his truck entering an alley.  He followed the truck and maneuvered his car to block the only way out of the alley.  Alboslemy then parked his car and stepped out to confront the driver of the truck.  At this point, the driver of the truck, Tunby, exited the truck and stood facing Alboslemy.  Alboslemy declared, "This is my truck.  What are you doing with my

---

[1]     All subsequent statutory references are to the Penal Code.

truck?" Tunby replied, "No, it's mine." Alboslemy believed that Tunby may have been under the influence of drugs, so he told Tunby, "Stay there. I'm going to call the police."

Tunby then returned to the truck and started driving. Initially, Tunby drove forward but hit a curb. He then tried to reverse but a chain hanging on the truck caught onto a pole and impeded the truck from moving. Alboslemy told Tunby to stop and that he was on the telephone with the police department.

Tunby exited the truck, this time with a folding pocketknife in his hand. Standing approximately 11 feet from Alboslemy, Tunby started running, with the knife in his hand above his head, toward Alboslemy and told Alboslemy to leave. Upon seeing the knife, Alboslemy returned to his car, locked the doors, and reversed out of the alley. He saw Tunby attempting to move the truck backward and forward, but the chain hanging from the truck remained entangled with the pole and hindered the truck's movement. Tunby eventually managed to drive the truck out of the alley. Still on the telephone with the police department, Alboslemy recounted what was happening to the police.

Alboslemy then followed the truck in his car, but the police instructed him to stop and Alboslemy decided to wait at a store. The police soon found the truck, initiated a traffic stop, and ordered Tunby at gunpoint to get on the ground. Tunby initially complied, but then ran. Roughly two hours later, the police arrested Tunby.

At trial, Tunby testified on his own behalf. Intermittently, for over a year, Tunby had been living unsheltered in an encampment near West Ball Road and South Magnolia Avenue in Anaheim, California. To survive, Tunby would recycle items and "car fish," the act of opening unlocked vehicle doors at night and checking if the vehicle interior had any money. Occasionally, if it was cold outside, Tunby would sleep in unlocked vehicles. Tunby testified that he smoked methamphetamine, which caused paranoia and delusions.

3

Tunby testified that, between 12:30 a.m. and 1:30 a.m. on March 26, 2021, he was car fishing on West Ball Road and noticed a tow truck with a broken window. Tunby entered the truck and, upon seeing a key in the ignition, drove the truck to an empty parking lot, where he parked and slept for the night. At around noon, Tunby woke up, put on overalls that he found in the truck, and started driving the truck around the area.

As he drove out of a supermarket parking lot, Tunby heard honking behind him and saw a car following him. Tunby turned into an alley and, as he looked down the alley, he saw the car reverse into the alley and position itself at an angle to block the alley. The driver of the car, remaining inside his car, then started screaming at Tunby. Unable to hear the driver because of the truck's engine noise, Tunby waved at the driver to move and then exited the truck to speak with the driver. When Tunby exited the truck, the driver reversed and pulled to the side of the alley, giving Tunby sufficient space to exit the alley. Tunby testified that he did not have or brandish a knife at the driver and that he never spoke to the driver. After leaving the alley, Tunby continued driving the truck until the police pulled him over and later arrested him.

The prosecution charged Tunby with two counts of carjacking, count 1 being based on the facts recited above. At the close of the prosecution's case in chief, Tunby moved for entry of judgment of acquittal as to count 1. (§ 1118.1.) The court denied the motion. A jury convicted Tunby of carjacking on both counts of carjacking.[2] Tunby filed a timely notice of appeal.

---

[2]     Count 2 is not relevant to this appeal and involved a different victim. That victim started her car and then left the engine running while she moved her father's car to a parking space. When she returned and opened her car door, a man grabbed the door, pushed her aside, and drove away with the car. Shortly after, the victim heard that her car had crashed nearby. DNA results showed that Tunby's DNA profile was consistent with the DNA found in the car.

DISCUSSION

This case presents an unusual set of facts to support a carjacking conviction. In the typical carjacking case, a defendant takes a vehicle and uses force or fear, contemporaneously or soon after the taking, to deprive the person in possession of the vehicle. In the present case, a substantial gap in time exists between the taking and Tunby's use of force or fear to retain possession of Alboslemy's tow truck. Tunby contends that insufficient evidence supports the carjacking conviction and that his actions do not amount to a carjacking. The Attorney General argues that Tunby's theft of Alboslemy's tow truck became a carjacking when Tunby pulled out a knife to retain possession of it in the alley.

*A. Standard of Review*

In evaluating whether the sufficiency of the evidence supports a conviction, "'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Powell* (2018) 5 Cal.5th 921, 944.) We "'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'" (*People v. Rayford* (1994) 9 Cal.4th 1, 23.) "All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, and every reasonable inference the jury could draw from the evidence is indulged." (*People v. Coleman* (2007) 146 Cal.App.4th 1363, 1367 (*Coleman*).) "'[A]n appellate ruling of legal insufficiency is functionally equivalent to an acquittal and precludes a retrial.'" (*People v. Story* (2009) 45 Cal.4th 1282, 1295.)

"But where, as here, the question is whether the language of the statute itself supports a conviction, 'our role is to ascertain the Legislature's intent so as to effectuate the purpose of the law.'" (*Coleman*, *supra*, 146 Cal.App.4th at p. 1367.) In deciphering legislative intent, we first examine the text of the statute, as the text is "the

5

most reliable indicator of legislative intent." (*People v. Lopez* (2003) 31 Cal.4th 1051, 1056 (*Lopez*).) If the text is "clear and unambiguous, the plain meaning of the statute governs." (*Ibid.*) But if the text "'supports more than one reasonable construction, we may consider "a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part."'" (*Ibid.*) In reviewing these extrinsic aids, we choose the construction that aligns closest "'with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.'" (*Ibid.*)

*B. Carjacking: Applicable Law*

Section 215, subdivision (a), defines carjacking as "the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." In 1993, the Legislature established the crime of carjacking as "a direct offshoot of robbery," and "modeled the carjacking statute on the robbery statute." (*Lopez, supra*, 31 Cal.4th at pp. 1057, 1059.) "'Both [statutes] involve "the felonious taking" of property that is "in the possession of another" person. Both require that the taking be from the "person or immediate presence" of the person. Both are "accomplished by means of force or fear."'" (*Id.* at p. 1059.)

The legislative history illustrates the mischief that the carjacking statute sought to address: the rise in carjackings and the difficulty in prosecuting such cases under the robbery statute. (*Lopez, supra*, 31 Cal.4th at p. 1057.) "'According to the author [of the legislative bill]: [¶] There has been *considerable increase in the number of persons who have been abducted,* many have been subjected to the violent taking of their

6

automobile and some have had a gun used in the taking of the car.  This relatively 'new' crime appears to be as much thrill-seeking as theft of a car.  If all the thief wanted was the car, *it would be simpler to hot-wire the automobile without running the risk of confronting the driver.*  People have been killed, seriously injured, and placed in great fear, and this calls for a strong message to discourage these crimes.  Additionally law enforcement is reporting this new crime is becoming the initiating rite for aspiring gang members and the incidents are drastically increasing.  [¶]  Under current law there is no carjacking crime per se and many carjackings cannot be charged as robbery because it is difficult to prove the intent required of a robbery offense (to permanently deprive one of the car) since many of these gang carjackings are thrill seeking thefts.  There is a need to prosecute this crime.'  (Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 60 (1993– 1994 Reg. Sess.) July 13, 1993, p. 1, italics added.)"  (*Ibid.*)

   After analyzing the legislative history, one appellate court concluded, "the *reason* for a special statute on the subject, with a penalty greater than that for second degree robbery, is that carjacking is a particularly serious crime that victimizes persons in vulnerable settings and, because of the nature of the taking, raises a serious potential for harm to the victim, the perpetrator and the public at large."  (*People v. Antoine* (1996) 48 Cal.App.4th 489, 495 (*Antoine*), citing Committee Analysis of Assem. Bill No. 6 (1993– 1994 Reg. Sess.); Sen. Floor Analysis of Assem. Bill No. 6 (1993–1994 Reg. Sess.) as amended Sept. 9, 1993; Sen. Rules Com., 3d reading analysis of Assem. Bill No. 6 (1993–1994 Reg. Sess.).)  In short, the Legislature aimed "to address a specific problem—the taking of a motor vehicle directly from its occupants"—and "to impose a severe penalty on those who created a specific risk by directly confronting a vehicle's occupants."  (*Coleman*, *supra*, 146 Cal.App.4th at p. 1369.)

Because "the Legislature modeled the carjacking statute on the robbery statute," courts have relied on robbery cases to interpret the carjacking statute.  (*Lopez*, *supra*, 31 Cal.4th at p. 1059; see *Coleman*, *supra*, 146 Cal.App.4th at pp. 1369–1370 [discussing courts' reliance on robbery cases].)  The first element of carjacking, "the felonious taking of a motor vehicle in possession of another" (§ 215, subd. (a)), requires "gaining possession of the victim's property, and . . . carrying away the loot." (*Lopez*, *supra*, 31 Cal.4th at pp. 1056, 1060–1061 [applying the common law meaning of "felonious taking" in robbery to carjacking].)  "Possession" means "the exercise of dominion or control." (*Coleman*, *supra*, 146 Cal.App.4th at p. 1370.)

The taking must be from the "person or immediate presence" of the person. (§ 215, subd. (a).)  "'A vehicle is within a person's immediate presence for purposes of carjacking if it is sufficiently within his control so that he could retain possession of it if not prevented by force or fear.'" (*People v. Johnson* (2015) 60 Cal.4th 966, 989.)  "[T]he victim need not actually be physically present in the vehicle when the confrontation occurs." (*People v. Medina* (1995) 39 Cal.App.4th 643, 650.)  "[T]he Legislature would not have included two areas of taking, namely, from the person or from the immediate presence, if it had intended to require actual physical possession." (*People v. O'Neil* (1997) 56 Cal.App.4th 1126, 1131 (*O'Neil*).)

C. Analysis

### 1. Tunby's conduct does not amount to a carjacking

Here, in the early hours of the morning, Tunby spotted Alboslemy's tow truck parked on the street, with the key in the ignition, and drove off with the tow truck. The taking was completed at that point.  By the late afternoon, when Alboslemy encountered Tunby in the alley, Tunby had possessed the truck for over 14 hours, having slept in the truck and driven it around the area.  Because Tunby had possession of the truck for at least half a day, a "felonious taking" could not have occurred in the alley. Tunby only used force or fear, the wielding of a knife, to retain the possession of the

8

truck that he had previously unlawfully taken.  The use of the knife was a separate act from the taking.  In the absence of any taking connected to the use of force or fear in the alley, a carjacking conviction cannot be sustained.

The Attorney General argues that the instant case is analogous to *O'Neil*, *supra*, 56 Cal.App.4th 1126.  In that case, the victim woke up to the sound of his pickup truck starting in his driveway.  (*Id.* at p. 1128.)  He dashed outside, reached the truck, and, after struggling to open the truck door, jumped into the truck bed.  While the defendant was driving, the victim and the defendant yelled at each other.  As the exchange intensified, the victim requested the defendant to drive him back.  (*Ibid.*)  The defendant turned around and stopped near the victim's home, where the two continued arguing.  (*Id.* at pp. 1128–1129.)  At that point, the victim became scared and left, and the defendant sped away.  (*Id.* at p. 1129.)  The court concluded there was substantial evidence to support a carjacking conviction.  (*O'Neil*, *supra*, 56 Cal.App.4th at p. 1134.)

*O'Neil* held that carjacking "is not limited to cases in which a defendant initially gains possession by dispossessing the victim of the vehicle through the use of force or fear."  (*O'Neil*, *supra*, 56 Cal.App.4th at p. 1131.)  "Just as a 'mere theft becomes robbery if the perpetrator, having gained possession of the property without use of force or fear, resorts to force or fear while carrying away the loot' [citation], so mere vehicle theft becomes carjacking if the perpetrator, having gained possession of the motor vehicle without use of force or fear, resorts to force or fear while driving off with the vehicle."  (*Ibid.*)  "[T]he serious potential for harm . . . exists whenever there is a confrontation between the taker of a vehicle and the victim 'and in no way depends on whether the confrontation and use of "force or fear" occurs before, while, or after the defendant initially takes possession of the vehicle.'"  (*Id.* at p. 1133.)  The court found that "while defendant was still in the process of taking, the victim arrived, confronted the defendant," and hopped in the truck bed.  (*Id.* at p. 1132.)  "Assuming defendant's initial

9

taking of the car constituted a mere vehicle theft, that theft became a carjacking once defendant resorted to the use of fear to retain possession of the truck." (*Ibid.*)

The Attorney General's reliance on *O'Neil* is misplaced because it is factually distinguishable. In *O'Neil*, the defendant was in the process of taking the truck when the victim encountered the defendant. That is, the taking was not completed. In contrast, Tunby completed the taking of the truck in the early hours of the morning. After half a day passed, he still had possession of the truck when Alboslemy confronted him in the alley.

The Attorney General also quotes from *O'Neil* to argue that Tunby continued to effectuate the taking in the alley. Specifically, the Attorney General recites, "[M]ere vehicle theft becomes carjacking if the perpetrator, having gained possession of the motor vehicle without use of force or fear, resorts to force or fear while driving off with the vehicle." (*O'Neil*, *supra*, 56 Cal.App.4th at p. 1131.) We do not interpret this language so broadly as to eliminate the need for temporal proximity between the initial theft and the use of force or fear. Although the taking and use of force or fear need not be contemporaneous, the gap in time between the two cannot be so protracted that it becomes too attenuated to draw a connection between them. In addition to authorities cited by the parties, we have independently reviewed carjacking and robbery cases and found that, wherever force or fear is used to retain possession of a vehicle, it occurs nearly contemporaneously with the initial taking. (See, e.g., *People v. Hudson* (2017) 11 Cal.App.5th 831, 838 [finding a carjacking, where, soon after the defendant took a car peacefully, the defendant used force—the movement of the car—to retain possession and "to overcome the victim's resistance"]; *People v. Lopez* (2017) 8 Cal.App.5th 1230, 1233, 1237 [a carjacking occurred when the defendant took the vehicle without force or fear, but immediately after used force—driving the vehicle while the victim held onto the door handle—to retain possession]; *People v. Gomez* (2008) 43 Cal.4th 249, 267 [finding a robbery, where, after the defendant took the victim's property, the defendant used

10

force—shooting at the victim—to retain the property].)  Accordingly, because the present case is factually distinguishable from *O'Neil*, it cannot be said a carjacking occurred in the alley when Tunby used force or fear to retain possession of the truck.

### 2. *Alboslemy never possessed the truck in the alley*

The Attorney General also argues that, by blocking Tunby and the truck from exiting the alley, Alboslemy had retaken possession of his truck.  If so, according to the Attorney General, then Tunby took the truck from Alboslemy's possession in the alley and then pulled out a knife immediately thereafter.  But at no point in the alley did Alboslemy enter the truck or drive it.  He stood several feet away from the truck, whereas Tunby stood next to the truck and had easy access to the ignition key to start the truck.  Tunby even drove the truck in the alley, not once but twice (albeit the second time after wielding a knife).  He never relinquished possession—that is, dominion or control.  Merely blocking the only exit did not prevent Tunby from controlling the truck.  Alboslemy therefore lacked dominion or control over the truck and did not regain possession of it in the alley.

Similarly, we reject the Attorney General's contention that Tunby took the truck in the immediate presence of Alboslemy.  The Attorney General asserts Tunby took the truck when Alboslemy had sufficient control of the truck to *retain* possession of it but for Tunby's use of force or fear.  We recognize that a carjacking may happen when "neither the possessor nor the passenger is inside or adjacent to the vehicle." (*Coleman*, *supra*, 146 Cal.App.4th at p. 1373.)  But, as explained above, Alboslemy, despite being within close physical proximity of the truck, did not exercise control over the truck in the alley.  Tunby did.  Accordingly, Alboslemy could not have had sufficient control of the truck to keep possession of it.

11

*3. A carjacking conviction would contravene the legislative intent*

Finally, Tunby did not engage in the type of conduct that the carjacking statute was designed to address. The legislative history reveals that section 215 sought "to address the serious problems and risks arising from the theft of vehicles directly from persons in the vehicle." (*Coleman*, *supra*, 146 Cal.App.4th at p. 1372.) "[T]he *reason* for a special statute on the subject, with a penalty greater than that for second degree robbery, is that carjacking is a particularly serious crime that victimizes persons in vulnerable settings and, because of the nature of the taking, raises a serious potential for harm to the victim, the perpetrator and the public at large." (*Antoine*, *supra*, 48 Cal.App.4th at p. 495.) The taking here was completed in the early hours of morning when no one or hardly anyone would be nearby. Tunby's taking of the truck did not pose the kind of danger that the Legislature had in mind in crafting the carjacking statute. It was a theft and was well over by the time Alboslemy confronted Tunby in the alley a half day later.

We conclude insufficient evidence supports a carjacking conviction and Tunby did not commit a carjacking as alleged in count 1.[3] We therefore reverse the carjacking conviction on count 1, with retrial prohibited. The taking was completed in the early hours of the morning without force or fear. Then, a half day later, Tunby pulled out a knife to retain possession of the truck, an act distinct from the taking. Tunby's conduct is outside the scope of the statutory language in section 215 and beyond the statutory purpose of taking a motor vehicle directly from its occupants (or their immediate presence).

---

[3] The Attorney General asserts that Tunby is inviting us to reweigh the evidence and that we should decline that invitation. But the relevant facts are not in dispute. The main issue is whether Tunby's conduct qualifies as carjacking under section 215. In reversing the carjacking conviction, we are in no way reweighing the evidence but only applying the law.

## DISPOSITION

Appellant's conviction for carjacking on count 1 is reversed. His conviction for carjacking on count 2 is affirmed. The matter is remanded for resentencing.

DELANEY, J.

WE CONCUR:

O'LEARY, P. J.

SANCHEZ, J.